## UNITED STATES v. WAYNE PUMP CO. et al. (two cases).

### Nos. 32597, 32598.

District Court, N. D. Illinois, E. D.

Feb. 17, 1942.

Leo F. Tierney and Daniel B. Britt, Sp. Assts. to Atty. Gen., and Willis L. Hotchkiss and James C. Cramond, both of Washington, D. C. (Thurman Arnold, Asst. Atty. Gen., Paul D. Page, Jr., Sp. Asst. to Atty. Gen., and J. Albert Woll, U. S. Atty., of Chicago, Ill., of counsel), for the United States.

Harold F. McGuire, of Washington, D. C., and James M. Carlisle and Arthur S. Lytton, both of Chicago, Ill., for Veeder-Root, Inc., G. H. Anthony, and J. H. Chaplin.

James H. Winston, John C. Slade, and George W. Ott, all of Chicago, Ill., for Gilbert & Barker Mfg. Co. and S. C. Hope.

Edward R. Johnston, Charles L. Byron, and Howard Somervell, all of Chicago, Ill., for Wayne Pump Co. and B. F. Geyer.

Harold W. Norman, of Chicago, Ill., Louis F. Niezer, of Fort Wayne, Ind., Ballard Moore, of Chicago, Ill., for Tokheim Oil Tank & Pump Co.

Barry Gilbert, of Chicago, Ill., for Gasoline Pump Mfrs. Ass'n and G. Denny Moore.

SULLIVAN, District Judge (after stating the facts as above).

Two indictments have been returned against these defendants. In indictment No. 32597 they are charged with combining and conspiring "to fix, maintain and control arbitrary, artificial and non-competitive prices for the sale of computer pumps" in interstate commerce in violation of Section 1 of the Sherman Act. In indictment No. 32598 defendants are charged with combining and conspiring to monopo-

lize the manufacture and sale of computing mechanisms in interstate commerce, in violation of Section 2 of the Sherman Act. Defendants Wayne Pump Company, G. & B., and Tokheim are manufacturers of computer pumps, and defendant Veeder is a manufacturer of computing mechanisms. Computer pumps and computer mechanisms, the subject matter of both the price fixing and the monopoly indictments, are covered by patents issued by the United States.

The indictments set out that the development of gasoline pumps has paralleled the major changes and improvements in the manufacture of automobiles; that from a rather crude beginning the type of gasoline pump in general was improved from time to time; that prior to 1932, however, a pump had not been developed which would automatically calculate and register both the qauntities and prices of the gasoline dispensed.

On November 22, 1932, the United States patent office issued to one Jauch, an employee of the Wayne Pump Company, a patent covering the computer pump, which was subsequently assigned to the Wayne Company. The indictments set out that this patent revolutionized the gasoline pump business, and that as soon as computer pumps were placed on the market they superseded all other types of pump, so that by 1939 they represented over 90% in value of gasoline pumps manufactured and sold in this country. That the computer pump was greatly favored by the public because the customer was able to see at a glance both the price and quantity of the gasoline he had purchased, and that so great has been the shift in public demand from non-computer pumps to computer pumps that for several years it has been all but impossible for any gasoline pump manufacturer to continue in business unless he manufactured computer pumps.

Following the grant of the Jauch patent and the commercial development of the computer pump manufactured thereunder, it appears that the Wayne Pump Company granted licenses to G. & B. and Tokheim to make, use and sell computer pumps. The indictments set out that at a later period, when the computer pump became a success and the public demand for it became great, the Wayne Company granted licenses to eight other pump manufacturers. As owner of the patent the Wayne Company had the right to grant these licenses on its own terms and conditions, just as it had a right to completely exclude all others from making, using or selling computer pumps for the time prescribed in the statute, provided only that in so doing it did not violate any other law.

In the case of Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co., 7 Cir., 154 F. 358, 361, a patentee's rights were challenged under the Sherman Act. In sustaining the patentee's rights Judge Baker said: "Under its constitutional right to legislate for the promotion of the useful arts, Congress passed the patent statutes. The public policy thereby declared is this: Inventive minds may fail to produce many useful things that they would produce if stimulated by the promise of a substantial reward; what is produced is the property of the inventor; he and his heirs and assigns may hold it as a secret till the end of time; the public would be largely benefited by obtaining conveyances of these new properties; so the people through their representatives say to the inventor: Deed us your property, possession to be yielded at the end of 17 years, and in the meantime we will protect you absolutely in the right to exclude every one from making, using, or vending the thing patented, without your permission. [Citing cases.] Congress put no limitations, excepting time, upon the monopoly. Courts can create none without legislating. * * * Use of the invention cannot be had except on the inventor's terms. Without paying or doing whatever he exacts, no one can be exempted from his right to exclude. Whatever the terms, courts will enforce them, provided only that the licensee is not thereby required to violate some law outside of the patent law, like the doing of murder or arson."

In Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 753, 52 L.Ed. 1122, the court said:

" 'The inventor is one who has discovered something of value. It is his absolute property. He may withhold a knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention.'

*    *    *    *    *

"It [a review of prior cases] shows that, whenever this court has had occasion to speak, it has decided that an inventor receives from a patent the right to exclude others from its use for the time prescribed

in the statute. 'And, for his exclusive enjoyment of it during that time, the public faith is forever pledged.'"

In Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 756, 46 L. Ed. 1058, the owner of the patent granted a license to a manufacturer to manufacture harrows under the patent. The suit against the manufacturer was one to recover damages for a violation of licenses and to restrain further violations. Mr. Justice Peckham, in his opinion, rendered in 1902, said:

"But that statute [Sherman Anti-Trust Law] clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act, we have no doubt, was never contemplated by its framers.

    \*    \*    \*    \*    \*

"The owner of a patented article can, of course, charge such price as he may chose, and the owner of a patent may assign it, or sell the right to manufacture and sell the article patented, upon the condition that the assignee shall charge a certain amount for such article."

In United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 198, 71 L.Ed. 362, suit in equity was brought by the Government against the General Electric Company and the Westinghouse Electric Company to enjoin them from prosecuting a plan for the distribution and sale of patented electric lamps. The General Electric Company was the owner of patents on tungsten-filament-incandescent lamps, and in granting a license under its patents to the Westinghouse Company it fixed the price at which the Westinghouse Company could sell the patented lamps. After examining various cases on the subject, including Bement v. National Harrow Co., supra, the Supreme Court said that the authority of the Bement case "has not been shaken by the cases we have reviewed." In dismissing the Government's bill and sustaining the right of the patentee-licensee to fix prices and impose other conditions under which the licensee could make, use, and vend the patented article, the court said: "The patentee may make and grant a license to another to make and use the patented articles but withhold his right to sell them. The licensee in such a case acquires an interest in the articles made. \* \* \* But if he sells them he infringes the right of the patentee, and may be held for damages and enjoined. If the patentee goes further, and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? We think he may do so provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly. One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold. The higher the price, the greater the profit, unless it is prohibitory. When the patentee licenses another to make and vend and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent but not so as to destroy the profit that I wish to obtain by making them and selling them myself.'"

In Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co., 8 Cir., 154 F. 358, 363, the Rubber Tire Wheel Company, owner of the Grant patent on rubber tire wheels, had granted a number of licenses under which it exacted royalties, fixed the price at which licensees could sell the patented product, and imposed other terms and conditions. Suit was brought by the licensor to collect royalties from the licensee, and the defense was set up that the license arrangement was unlawful under the Sherman Act. In reversing the lower court, the Circuit Court of Appeals for this Circuit held that the patentee-licensee had the right to fix prices on the patented article and to impose other conditions, and in sustaining the right of the licensor to recover its royalties, Judge Baker said: "The only grant to the patentee was the right to exclude others, and to have and to hold for himself and his assigns a monopoly, not a right limited or conditioned according to the sentiment of judges, but an absolute monopoly constitutionally conferred by the sovereign lawmakers. Over and above an absolute monopoly created by law, how can there be a further and an unlawful monopoly in the same thing? If plaintiff were the sole maker of Grant tires, how could plaintiff's control of prices and out-

put injure the people, deprive them of something to which they have a right? Is a greater injury or deprivation inflicted, if plaintiff authorizes a combination or pool to do what plaintiff can do directly? To say yes means that substance is disregarded, that mere words confer upon the people some sort of a right or interest counter to the monopoly, when by the terms of the bargain the people agreed to claim none until Grant's deed to them shall have matured."

The indictments here charge the defendants Wayne Pump Company, G. & B., and Tokheim with "using the Jauch patent" for the purpose of fixing prices among themselves on the sales of computer pumps, and for the purpose of restricting the manufacture and sale of such pumps. There is no charge that defendants fixed the prices of gasoline pumps generally, or restricted their manufacture and sale. They are charged only with fixing the prices of computer pumps, a right which the Wayne Pump Company already had under the statutory monopoly granted by the Government when its patent was issued. What is meant by the phrase "used the Jauch patent" is not quite clear. If the defendants did more than enter into ordinary patent license agreements, under the terms of which the Wayne Pump Company, as owner of the patent, licensed the others to manufacture computer pumps, and fixed the prices at which the pumps should be sold; or if the Government claims that these defendants were involved in some offense under the Sherman Act other than the exercise of a patent monopoly, then such offense should be set out clearly in the indictments.

While ownership of the patent gives to the patentee a complete monopoly within the field of his patent, it of course does not give him any license to violate the provisions of the Sherman Act or of any other law. Under his monopoly he may not use his patent as a pretext for fixing prices on an unpatented article of commerce; nor fix the resale price on his patented article; nor make use of "tying clauses." In the case of Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107, the patent owner and its licensees entered into a scheme for fixing prices on a common article of commerce—unpatented bath tubs— and then by a pretended use of a process patent attempted to evade the Sherman Act. This is obviously not the instant case, and the indictments do not allege that there was any understanding or agreement among the defendants to use the patent to fix prices on any unpatented article. In fact there is no allegation that there was any understanding or agreement among the defendants at all, aside from the allegation that they "knowingly have entered into and engaged in a combination and conspiracy to fix and maintain noncompetitive prices and to monopolize the manufacture and sale of computer pumps and computing mechanisms, by the doing of the things set out." The things and means then set out are things which I believe the patentee, under its patent already had the right to do.

The Government argues that the instant case and the Bath Tub case have one basic common theme, that is conspiracy, joint action, agreement to use the patent for the purpose of fixing prices among themselves. The difficulty is that the Government fails to set out any identifying facts to show that the Wayne Pump Company and its licensees did anything more than the law permitted them to do under the monopoly granted by the patent. How they took joint action or entered into joint agreements to use the Jauch patent to achieve the alleged illegal objectives, or how they went outside the monopoly granted to the patentee and its licensees, is nowhere set out in the indictments.

The indictments also allege, as another of the means used to accomplish the illegal objectives, that the defendant Wayne Pump Company, with the consent of G. & B. and Tokheim, approached gasoline pump manufacturers purchasing computing mechanisms from Neptune, and other gasoline pump manufacturers using computing mechanisms of their own make in the manufacture of computer pumps, and attempted to induce each of such manufacturers to accept a license under the Jauch patent; and that the Wayne Pump Company, with the authorization of G. & B. and Tokheim, would issue such license to each of such manufacturers on terms securing to the defendants control of all of the new licensee's patents on computing mechanisms and computer pumps and of the licensee's prices for the sale of computer pumps. Also that the defendant Wayne, with the consent of G. & B. and Tokheim, attempted to compel Neptune, the sole manufacturer and seller of computing mechanisms other

than Veeder, to forever acknowledge the validity of the Jauch patent, to submit all patents on computer pumps and computing mechanisms owned or controlled by Neptune to uses determined by Wayne, and to refrain from manufacturing or selling computing mechanisms except to customers approved by Wayne, G. & B. and Tokheim.

Again it is not clear what is meant by the allegation that defendants attempted to compel Neptune to submit all patents owned or controlled by it on computer pumps "to uses determined by Wayne." With the issuing of the Jauch patent the Wayne Company dominated the computer pump field. In fact the indictments allege that the public demanded the new invention and that nineteen gasoline pump manufacturers ceased to do business because they did not have licenses to manufacture the computer pump. The entire world, other than the Wayne Company, was excluded for seventeen years from making, using or selling computer pumps, or any combination machine or unit which embodied the five elements described by Judge Slick in the case of Wayne Company v. Anchor Oil Company, D.C., 20 F.Supp. 745, 746, as follows: "(1) A source of liquid supply. (2) A pump, the suction side of which is connected to said source of liquid supply. (3) A meter. (4) A registering means operated by said meter for registering the liquid dispensed and the cost thereof. (5) Means for changing the relation between the cost operating portion and the amount operating portion whereby the unit cost per unit amount dispensed may be varied."

Judge Slick held the Jauch patent valid, and that the Neptune Company (manufacturer of computing mechanisms which were ultimately sold to the Anchor Company) was an infringer of the Wayne patent. The Neptune Company and the Anchor Oil Company were thereafter precluded from manufacturing, selling or using computer mechanisms for computer pumps, and all gasoline pump manufacturers who purchased computing mechanisms from them and used the same in the manufacture of computer pumps would also be infringers. Under these conditions I fail to see how defendants aided in carrying out an unlawful conspiracy because defendant Wayne Company, with the consent of G. & B. and Tokheim, approached gasoline pump manufacturers, who had purchased computer mechanisms from Neptune and other manufacturers, and attempted to induce them to accept licenses under the Jauch patent. If in attempting to induce these manufacturers to accept such licenses, the Wayne Company, or any other of the defendants, made use of unlawful means, then those facts should be set out in the indictments. The indictments complain that an indispensable element of every computer pump is the computing mechanism, and without a source of supply of such mechanisms a manufacturer cannot make computer pumps. Under Judge Slick's decision, even with a supply of computer mechanisms no manufacturer can use them in the manufacture of computer pumps, save only as he is licensed by the Wayne Company to do so. Judge Slick held that the Jauch patent covered a meter and a registering means operated by said meter for registering the liquid dispensed and the cost thereof. It therefore follows that everyone making, using or selling this computer mechanisms in connection with a computer pump would be an infringer.

The indictment also charges as one of the means or devices used in bringing about the combination or conspiracy that "the defendants Veeder, G. & B. and Tokheim acknowledge the validity of the Jauch patent." When G. & B. became licensees they were estopped from denying the validity of their licensor's patent, and I see nothing illegal or unlawful in the licensor requiring of them that they acknowledge the validity thereof, especially, as here, where its validity had already been established by the United States District Court of Indiana. Agreements which provide that licensees recognize the validity of the patent beyond the termination of the license are valid agreements. United Shoe Machinery Co. v. Caunt, C.C., 134 F. 239; Eskimo Pie Corp. v. National Ice Cream Co., D.C., 20 F.2d 1003; Id., 6 Cir., 26 F.2d 901. If any unlawful means were used in securing this acknowledgment, then the indictments should set them out clearly enough for defendants to meet these charges.

Another means or device complained of in the indictments is that defendants determined jobbers resale prices for computer pumps, refused to sell computer pumps to any jobber failing or refusing to adhere to such resale prices, and that they eliminate discounts to all jobbers in the event of a general failure by jobbers to adhere to the said resale prices.

958

■ In a long line of decisions the United States Supreme Court has held that attempts to regulate future prices or future marketing of a patented article after complete sale by the owner thereof, were not valid exercises of the patent monopoly, and amounted to unlawful restraint of trade, invalid at common law, and, so far as interstate commerce was concerned, invalid under the Sherman Anti Trust Act of July 2, 1890, 15 U.S.C.A. § 1 et seq. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; United States v. A. Schrader's Son, 252 U.S. 85, 40 S.Ct. 251, 64 L. Ed. 471; Boston Store v. American Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann.Cas.1918C, 447; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann.Cas.1918A, 955.

The charge in the instant indictments is that "the said defendants determine jobbers' resale prices for computer pumps, refuse to sell computer pumps to any jobber failing or refusing to adhere to such resale prices, and eliminate discounts to all jobbers in the event of a general failure by jobbers to adhere to said resale prices." However, no facts are set out to show that the Wayne computer pumps were sold through jobbers, nor are the names of any specific jobbers given with whom these defendants carried on negotiations wherein the resale price of computer pumps was determined. In the case of United States v. Colgate & Co., D.C., 253 F. 522, 528, affirmed by the United States Supreme Court in 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443, defendant was indicted for conspiracy to fix the resale price at which wholesale and retail dealers might sell its product, the reference being to wholesalers and retainers generally, as is the reference in the instant indictments to jobbers generally. In the Colgate case the court said: "It does not seem to the court that the alleged offense with which the defendant is charged is stated and set forth with that degree of accuracy and certainty required in criminal pleading. The facts in no particular combination, against any one set of wholesalers or retailers alleged to have been in combination with the defendant, are given, but merely that assurances and promises were made by the wholesale and retail dealers doing business with the defendant throughout the United States, and the Eastern District of Virginia, that its products would not be resold at retail other than at prices fixed by the defendant. This language is too general, and the defendant has the right at least to be informed of some one particular infraction of the law that it is claimed it has committed. It would be impossible to intelligently prepare a defense or answer to this indictment, as it involves the defendant's dealings with its wholesale and retail customers throughout the territory named, covering a period of three years. This is too indefinite, and there ought to be no difficulty, if such conditions exist, as set forth in the indictment, to name some specific instance of the alleged combination, and state the same in detail."

So in the case at bar, if these conditions exist, the Government should have no difficulty in setting forth at least one specific instance of where defendants determined the resale price at which jobbers might resell computer pumps. If this condition does exist, surely the Government must be in possession of the facts, and they should be set out in the indictments, so as to reasonably inform defendants of the offense with which they are charged.

"Tying clauses" are also prohibited by Section 3 of the Clayton Act, 15 U.S.C.A. § 14, but no facts are set out in the present indictments which charge defendants with the creation of a monopoly by means of "tying clauses."

■ The Government in its argument insists that competing patents are here involved, and that a monopoly of competing patents was acquired by some of the defendants in furtherance of the plan to carry out the conspiracy, but the indictments set out no facts whereby to identify these competing patents, nor in what manner nor by whom such monopoly in them was acquired. The Government also insists that not one but many patents on computer pumps, computing mechanisms and improvements thereon were used to achieve the illegal purpose or conspiracy, but again the indictments are silent as to the identity of the other patents aside from the Jauch patent issued in November, 1932. The indictments set out that changes in types of gasoline pumps have paralleled the major changes and improvements in the manufacture of automobiles; and that upon the advent of the computer pump it was so favored by the public that there was a marked shift from non-computer pumps to the computer type, and that it thereupon

became impossible for any gasoline pump manufacturer to continue to engage in such business unless he manufactured computer pumps. The Jauch patent dominated the computer pump field, and gave to its owners the right to exclude therefrom all others. As the indictment points out, the computer pump was so favored by the public that there was a definite shift to this type of pump, and it thereupon became impossible for any manufacturer to continue to engage in such business unless he manufactured the computer type of pump. This is the very thing they could do only with the permission of the Wayne Company and upon its terms and conditions. As said before, upon the issuance of the Jauch patent by the United States Government, the owner thereof was granted an absolute monopoly on the manufacture and sale of computer pumps at any price it chose to fix for same. Over and above this complete monopoly, I fail to see how the owner of the patent and its licensees could engage in any further and unlawful monopoly, unless they went outside of the domain of the patent and were guilty of doing things which the law does not permit them to do, and no factual allegations are set out in the indictments to show that they did this. I have read the indictments in their entirety several times, and in the various means, acts and devices whereby the combinations and conspiracies are alleged to have been accomplished. I do not find that defendants are charged with the doing of anything which they did not already have the right, under the patent, to do. The fixing of prices and monopoly to

manufacture and sell computer pumps, here complained of, were the very rights which the Wayne Company and its licensees enjoyed by reason of ownership of the patent. The courts have been unanimous in this construction of the rights of a patentee. If, in the interest of public policy, the monopoly which the patent laws confer upon an inventor seem too broad, redress must come from Congress not from the courts.

It is fundamental that in every indictment the defendant is entitled to be informed with such definiteness and certainty of the accusations against him as will enable him to make his defense, and avail himself of acquittal or conviction in any further prosecution for the same offense. Having in mind that the subject matter of the instant indictments is protected by a patent, I am of the opinion that the defendants here have not been furnished with such definite and particular allegations of fact as will meet this test. The charges are much too general. They do not adequately describe the nature of the alleged unlawful conspiracy agreements or arrangements which defendants are accused of having made, nor show how the defendants became parties thereto, nor how they collaborated in doing the unlawful things; nor set out any unlawful means whereby the unlawful objectives were accomplished.

Believing as I do, for the reasons heretofore stated, that the indictments are insufficient, the demurrers thereto will be sustained.