UNITED STATES of America, Plaintiff,

v.

BRANIFF AIRWAYS, INC. and Texas International Airlines, Inc., Defendants.

No. SA 75 CR 29.

United States District Court, W. D. Texas, San Antonio Division.

March 15, 1977.

John M. Pinckney, III, First Asst. U. S. Atty., San Antonio, Tex., Raymond W. Philipps, Stephen B. Gillman, Judy L. Whalley, U. S. Dept. of Justice, Antitrust Div., Washington, D.C., for the U. S.

Allan I. Mendelsohn, Washington, D.C., for Burton S. Kolko.

Melvin C. Garbow, David H. Lloyd, Steven P. Lockman, Peter T. Grossi, Jr., Arnold & Porter, Washington, D.C., J. Burleson Smith, Cox, Smith, Smith, Hale & Guenther, San Antonio, Tex., W. B. West, III, Clark, West, Keller, Sanders & Butler, Dallas, Tex., for Braniff Airways, Inc.

B. J. Bradshaw, Richard N. Carrell, Fulbright & Jaworski, Houston, Tex., George H. Spencer, Clemens, Spencer, Welmaker & Finck, San Antonio, Tex., for Texas Intern. Airlines, Inc.

AMENDED ORDER OF DISMISSAL

SPEARS, Chief Judge.

On this 16th day of February, 1977 the Court heard oral arguments by all parties upon the motion of the defendants to dismiss the indictment. For the reasons stated herein the Court bases this Order not only on particular grounds for dismissal set forth by the defendants, but also upon the totality of the circumstances surrounding this prosecution.

Defendants who are certificated interstate airline carriers were the subjects of a two-count indictment returned in this Division on February 14, 1975, for alleged violations of the Sherman Act in conspiring to prevent and exclude Southwest Airlines, Inc., an intrastate air carrier from doing business in Texas.

The respective positions of the Government and of the defendants have been exhaustively briefed and have been examined by the Court prior to argument. Seven principal grounds are presented by the motion to dismiss. As briefly as is possible, they may be summarized as follows:

1. The Court is without anti-trust jurisdiction over the competitive practices raised by the indictment, in that the Federal Aviation Act confers exclusive jurisdiction and pervasive regulatory authority upon the Civil Aeronautics Board with respect to such practices.

2. Under Section 414 of the Act, 49 U.S.C 1384, approval by the CAB of certain agreements among defendants and other CAB-certificated carriers which embrace the competitive practices challenged in this case relieved defendants from operation of the anti-trust laws and rendered them immune from prosecution.

3. Under the First Amendment, defendants' efforts to obtain administrative and judicial relief from the CAB and the Courts, in proceedings raising important issues of public policy concerning the power of the CAB to prevent intrastate air carriers from illegally burdening and engaging in interstate commerce, placed defendants beyond the reach of the anti-trust laws and are not subject to penalties.

4. Court decisions regarding transactions regulated by federal agencies, but less pervasively regulated than defendants' transactions, which refer matters to the agencies for initial decision under the doctrine of *primary jurisdiction,* suggests dismissal of the instant indictment as an *a fortiori matter.*

5. The indictment is impermissibly vague and fails to charge the essential facts as required by Rule 7(c), F.R.C.P., and further is a deliberate failure to present the Grand Jury with exculpatory information regarding the regulated character of the airline industry and the limited reach of the Sherman Act; such failure having the effect of misleading the grand jury and depriving it of its independence.

6. The Government's use before the second grand jury of their attorneys' own unsworn summaries and paraphrases of testimony presented by witnesses who appeared only before the first grand jury, violated the rules of this Court; unfairly manipulated the grand jury, deprived it of its independence, and tainted the indictment.

7. Burton S. Kolko, former chief of the CAB Agreements Division was ethically barred from accepting employment with the Anti-Trust Division and from accepting assignment to conduct grand jury proceedings in this case concerning the same matters he had considered and decided at the CAB, and on which he had recommended official decisions to the CAB. He was ineligible to participate in the grand jury proceedings in any capacity, was an unauthorized person before the grand jury, and his appearance in the grand jury room vitiates the indictment.

The first four grounds relate to jurisdictional objections to the prosecution. As set forth in the briefs and argued, they interpose statutory, constitutional and decisional reasons why the conduct complained of by the Government is not subject to criminal prosecution. These jurisdictional challenges are most directly presented by the defendants' reliance upon Section 414 of the Federal Aviation Act which expressly relieves from the operation of the anti-trust laws "any person affected by any order made under Sections 1378, 1379, or 1382" of Title 49, United States Code. Thus, the Federal Aviation Act undertakes to immunize carriers from actions or conduct which were it not for such protection would be subject to the impact of the Sherman Act and the attendant consequences of violation thereof.[1] The exemption thus afforded interstate air carriers enables them with impunity to enter into interline agreements which may in effect injure an intrastate

1. *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); *Scroggins v. Air Cargo, Inc.,* 534 F.2d 1124 (5 Cir. 1976); 49 U.S.C. 1384.

carrier such as Southwest, or conceivably put it out of business. This statute has been the subject of numerous decisions,[2] and its validity is in nowise under attack. Whether the exemption it affords may be excessively broad is a matter solely for congressional review.[3] Whether the actions of the defendants as charged in the indictment are each and all cloaked with the statutory immunity is hotly disputed.[4]

It becomes unnecessary, however, to further pursue this and the other jurisdictional attacks upon the indictment, as it is quite clear that it must be stricken due to impermissible conduct engaged in by the prosecution staff.

■ Mr. Burton S. Kolko was Chief of the Agreements Division of the Civil Aeronautics Board during all of the time when the allegedly illegal actions of the defendants were taking place. Among his duties was to examine, pass upon, approve or disapprove and make recommendations of all intercarrier agreements which were submitted to the CAB for its approval as required by law. Agreements which under the Government's point of view were part and parcel of the alleged conspiracy to injure Southwest were directly considered by Mr. Kolko and his staff, and reports thereon made to the Board. About the time that the second grand jury investigation of the defendants' activities was about to begin, Mr. Kolko left the employ of the CAB and became an employee of the anti-trust division for what he has stated as personal reasons to enhance his legal career. He was sworn in as a member of that staff, and almost immediately thereafter on April 10, 1974 Thomas E. Kauper, Assistant Attorney General in charge of the anti-trust division directed him by letter to proceed to this District to assist and prosecute in the on-going investigation of air transportation, including grand jury proceedings. Upon reaching San Antonio Mr. Kolko filed this letter with the Clerk of Court and executed the required oath of office. Thereafter, he spent the greater part of three days in the grand jury room while proceedings were under way to present this second grand jury with the Government's evidence. According to Mr. Kolko, he was present as an "observer", during which he did not participate in the case. He stated that his assignment to the San Antonio Grand Jury proceedings was to acquaint him with grand jury procedure of which he was totally unfamiliar, in order that he might undertake the presentation of a case to a California grand jury. Nevertheless, the Assistant Attorney General in commissioning Mr. Kolko to attend upon this San Antonio grand jury expressly directed him to assist in the investigation and prosecution of all proceedings growing out of those proceedings involving defendants. As such it is reasonable to expect that these prosecutorial duties would be carried out as specified. The law makes no provision for an "observer" in a grand jury room. So, if in fact, as Mr. Kolko and the anti-trust staff assert, he was present in the capacity of an observer, he was an unauthorized person. The Fifth Circuit has held that the participation of an unauthorized person in an investigation before a grand jury is unlawful, whether that participation be great or small; that it is not necessary that it be corrupt, or that unfair means were used. *Latham v. United States,* 226 F. 420, 424 (5 Cir. 1915). The very presence of an unauthorized person is

---

2. *Allied Air Freight, Inc. v. Pan Am World Airways, Inc.,* C.A.N.Y.1968, 393 F.2d 441, cert. den. 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117; *McManus v. C.A.B.,* C.A., 2 Cir. 1961, 286 F.2d 414, cert. den. 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 388.

3. Constitutionality upheld in *McManus v. C.A.B.,* supra. It follows that any change in scope and coverage must likewise be made by the Congress, if at all. Hearings S.B. 2551, 94th Cong., 1st Sess., Sec. 9 (Oct. 22, 1975);

*Trans World Airlines, Inc. v. Hughes,* 332 F.2d 602, 606.

4. A recent indictment detailing the role of the CAB and the "tactics" allegedly used by the defendants may have been of great assistance to the Court if it had been necessary to resolve this issue. See pages 8–10, Order. For example, in *Pan American World Airways v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325, suit was instituted by the Attorney General at the request of the CAB.

condemned and is held ground per se for abating the indictment without proof of actual prejudice. *United States v. Amazon Industrial Chemical Corp.,* 55 F.2d 254, 261–262 (D.Md.1931). As stated in the earlier case of *United States v. Edgerton,* 80 F. 374 (D.Mont.1897), no inquiry is required into the effect of the presence of such an ineligible person. In *United States v. Borys,* 169 F.Supp. 366, 367 (D.Alaska 1959), the rule is that the appearance of an unauthorized person is a sufficient ground for setting aside an indictment without a showing of prejudice. As stated by one court, *United States v. Bowdach,* 324 F.Supp. 123, 124 (S.D.Fla. 1971), it is a hard and fast rule which allows for no exceptions.

· This Court, however, in the instant cause is presented with additional reasons for application of the rule against unauthorized persons. Although there may have been no intention of wrong-doing, it is indeed strange to find a former high CAB official who had passed upon many of the matters under investigation, to be present in a grand jury room where those very matters are under consideration, irrespective of the capacity in which he presented himself. It is without dispute that the court reporter had been instructed not to record anything which took place in the grand jury room except the testimony of live witnesses. Thus, it is unknown how Mr. Kolko was introduced to the grand jury. Mr. Philipps, the chief prosecutor who introduced him does not remember what he himself stated. Whether or not Mr. Kolko was known to the grand jury as a former CAB official cannot be ascertained.

■ Although Mr. Kolko had been given a copy of the fact memorandum prepared by the staff, covering what had taken place before the first grand jury, and upon deposition stated he expressed his surprise and chagrin in learning that one or more of the matters which he had passed upon while at the CAB were in fact under investigation by the grand jury, nothing whatever was done to rectify the situation prior to, during, or following Mr. Kolko's appearances in the grand jury room. One of the members

of the anti-trust staff, Mr. Coburn, acknowledged upon deposition that he knew Mr. Kolko as the chief of the Agreements Division of CAB and was well-acquainted with him. Neither Mr. Kolko, nor Mr. Philipps, nor Mr. Coburn, nor Assistant Attorney General Kauper, nor anyone else appears to have recognized any impropriety in placing Mr. Kolko before the grand jury in this proceeding. The courts have expressed a deep concern, and rightly so, that government attorneys be subject to exacting standards which negate conflicts of interest, and more so that their conduct may not suggest even an appearance of impropriety.

■ The defendants were indicted by a second grand jury impaneled to investigate the alleged misconduct of defendants, following upon an eighteen-month investigation by the original grand jury, which was dismissed after a failure to return an indictment. It is without dispute that the indicting jury was given summarized and excerpted testimony from the prosecutor concerning evidence presented to the original body. Only the extent thereof is controversial. Just what summaries and excerpted testimony were actually made and presented to the second grand jury is unknown, and will remain so because none were taken down by the court reporter in accordance with instructions given by the prosecutor. It is virtually beyond contradiction in the law that this mode of procedure will not be tolerated. In the cause before this court, the prohibition against such procedure is of particular significance for several reasons. First, this court in a proceeding known as *In Re May 1972 San Antonio Grand Jury,* reported at 366 F.Supp. 522 (1973), held that a second grand jury is capable of evaluating testimony received by another grand jury only if it sees the efforts of the prior grand jury *in toto.* In so holding this Court cited the opinion of Chief Judge Thomsen in *In Re Grand Jury Investigation of the Banana Industry,* 214 F.Supp. 856 (D.Md.1963), another anti-trust case, in which Judge Thomsen condemned such practice as lending convenience to the prosecutor at the expense of a fair grand jury investigation.

The salutary rationale is plain in Judge Thomsen's concern that a second grand jury render its verdict upon testimony it has heard in full, not from selected versions submitted by the prosecutor; that if any part of the testimony of the witness is to be read to another grand jury, the entire testimony should be so read in its complete unedited form, and then only when the witness is unavailable for recall. This Court in its May 1972 Grand Jury opinion agreed with Judge Thomsen that it could be potentially unfair and prejudicial to allow the government to select portions of the grand jury testimony for transfer, or to simply allow summaries of testimony to be transferred.

It was not possible that the anti-trust staff was unfamiliar with the decisions discussed above, and unlikely that it was unfamiliar with the same rule of law as generally understood. The record reflects that lead counsel Philipps was served a memorandum by hand citing this Court's decision *In Re May 1972 San Antonio Grand Jury* and warned of the impropriety in any selected presentation of portions of prior grand jury testimony—and that some ten days later the prosecutors disregarded the memorandum and proceeded with the presentation of their summaries. In so doing they also chose to disregard this Court's decision on the subject and that of Chief

Judge Thomsen. It appears to be the Government's position that just as long as it presents additional live witnesses to a second grand jury, it is free to disregard the rule, and to summarize and excerpt whatever it may choose to pick from the record of the original jury. Another excuse made before the Court is that the entire record of the first grand jury proceeding was placed upon a table in the room, and the grand jury invited to examine it. Still another excuse offered by the prosecutor is that of a *de minimis* approach—that all of such excerpts and summaries were minimal and therefore not improper. This attempt to avoid responsibility in presentation of evidence to the grand jury is without merit. What effect, if any, these departures from prescribed procedure had upon the decision to indict is unknown, and will remain so. The minds of the grand jurors cannot be looked into for the answer. The record cannot be examined because none exists, except of the testimony given by such live witnesses as were brought into the room.

■ Finally, the defendants attack the indictment as being impermissibly vague and failing to charge an offense. This two-count indictment is couched in the most general terms, "complete with the generic language of the Sherman Act", as stated by the defendants.[5] This was pointed out to

---

**5.** Pertinent excerpts from the indictment in this case are:

**COUNT ONE**

**IV. TRADE AND COMMERCE**

5. Air carriers are firms engaged in the transportation of passengers by air on a regularly scheduled basis for compensation. Air carriers which operate between two or more states must receive a certificate of authority from the Civil Aeronautics Board (hereinafter referred to as the "CAB"). The certificate issued by the CAB to an air carrier specifies with particularity the points to be served and the nature of the authority granted. The intrastate operations of an air carrier operating under certification by the CAB do not require approval by the particular state. Air carriers which operate wholly within one state may not require certification by the CAB, but may operate pursuant to certification of a state regulatory agency.

6. Braniff and TI are air carriers which have been authorized by the CAB to operate in various areas of the United States, including the State of Texas. Braniff and TI have operated as air carriers among the major Texas cities throughout the period of time covered by this indictment.

7. Southwest Airlines, Inc. (hereinafter referred to as Southwest), including its predecessor corporation Air Southwest, is not certified by the CAB, but operates as an air carrier within the State of Texas under authority received from the Texas Aeronautics Commission on or about November 6, 1970. On or about June 18, 1971, Southwest commenced operations and continues to operate as an air carrier between Dallas-Fort Worth and Houston, and Dallas-Fort Worth and San Antonio. Since November, 1971, Southwest has operated and continues to operate as an air carrier between Houston and San Antonio.

8. In 1970 Braniff transported approximately 86% of the passengers carried by air carriers

the Court at the arraignment and omnibus hearing, and as a result the Government

filed its Bill of Particulars. However, citing *Russell v. United States*, 369 U.S. 749,

operating between Dallas-Fort Worth and San Antonio; transported approximately 78% of the passengers carried by air carriers operating between Dallas-Fort Worth and Houston; and carried a substantial number of passengers between Houston and San Antonio. At the same time, TI transported substantial numbers of passengers between the above Texas cities.

9. During the period of time covered by this indictment, Braniff, TI and ·Southwest purchased in interstate commerce substantial amounts of aeronautical supplies and equipment including, among other things, aircraft, aircraft parts, aircraft fuel, and other commodities used in air transport operations.

10. Air carrier service among the major Texas cities involves and affects substantial amounts of interstate commerce.

### V. OFFENSE CHARGED

11. Beginning sometime prior to May, 1971, the exact date being unknown to the grand jurors, and continuing to at least 1973, the exact date being unknown to the grand jurors, the defendants and co-conspirators have engaged in a combination and conspiracy in unreasonable restraint of the aforesaid trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

12. The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which have been:

(a) to prevent and exclude Southwest from operating as an air carrier among the major Texas cities;

(b) to impair the ability of Southwest to operate as an air carrier among the major Texas cities.

13. In furtherance of the aforesaid combination and conspiracy, the defendants and co-conspirators have done those things which they combined and conspired to do, including among others:

(a) used tactics whose purpose and effect were to impede and delay Southwest's entry as a competitor and to increase the cost of such entry;

(b) exchanged and acted upon information regarding schedules, fares and other matters in order to disadvantage and injure Southwest; and

(c) jointly undertook a boycott of Southwest by measures designed to prevent passengers from cancelled Braniff and TI flights among the major Texas cities from traveling on Southwest flights.

### VI. EFFECTS

14. The aforesaid combination and conspiracy has had the following effects, among others:

(a) Southwest's entry into the transportation of passengers by air among major Texas cities was delayed;

(b) Southwest was denied the opportunity to compete freely in the transportation of passengers by air among the major Texas cities;

(c) Competition generally in the transportation of passengers by air among the major Texas cities has been unreasonably and arbitrarily suppressed; and

(d) The public has been denied the benefits of free and open competition in the transportation of passengers by air among the major Texas cities.

### COUNT TWO
### II. OFFENSE CHARGED

17. Beginning sometime prior to May, 1971, the exact date being unknown to the grand jurors, and continuing up to at· least 1973, the exact date being unknown to the grand jurors, the defendants and co-conspirators have engaged in a combination and conspiracy to monopolize the aforesaid trade and commerce in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

18. The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which have been:

(a) to prevent and exclude Southwest from operating as an air carrier among the major Texas cities; and

(b) to impair the ability of Southwest to operate as an air carrier among the major Texas cities.

19. In furtherance of the aforesaid combination and conspiracy, the defendants and co-conspirators have done those things which they combined and conspired to do, including among others:

(a) used tactics whose purpose and effect were to impede and delay Southwest's entry as a competitor and to increase the cost of such entry;

(b) exchange and acted upon information regarding schedules, fares and other matters in order to disadvantage and injure Southwest; and

(c) jointly undertook a boycott of Southwest by measures designed to prevent passengers from cancelled Braniff and TI flights among the major Texas cities from traveling on Southwest flights.

### III. EFFECTS

20. The aforesaid combination and conspiracy has had the following effects, among others:

(a) Southwest's entry into the transportation of passengers by air among the major Texas cities was ·delayed;

770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962), the defendants still insisting upon the insufficiency of the indictment observe: "It is a settled rule that a bill of particulars cannot save an invalid indictment". Any close examination of the indictment strongly suggests that it fails to set forth the specific acts and particular facts constituting the alleged offenses, and thus failed to state the essential elements of the crime which is charged.

■ Yet another reason for the alleged inadequacy of the indictments appears in the defendants' contention that it is clear from the face of the instrument that the grand jury was never informed of the immunization afforded interstate air carriers when their activities fall under the provisions of Section 414 of the Federal Aviation Act. This presents the interesting inquiry of how the grand jury could have possibly made a fair appraisal of the defendants' conduct as to criminality, when it was never informed that airline agreements and acts within the purview of the statutes enumerated in Section 414 of the Act are exempt by statute from prosecution. This is exculpatory information which the grand jury was entitled to have before it in order to determine whether the defendants had committed a crime.[6] No basis existed to indict these carriers under the Sherman Act if their conduct is immune by virtue of acts performed pursuant to Section 414. In its attempt to deal with this question, the Government asserts correctly that it is not required to inform the grand jury of possible defenses to be asserted at trial, nor to

negative them. Defendants make the distinction that per se there can be no criminality in conduct which is made immune by statute. Whether the acts and conduct of the defendants were performed pursuant to the immunization afforded by the Federal Aviation Act, thus becomes a matter for grand jury determination. Yet if the elements of immunity are unknown to the grand jury, if the very existence of a statute conferring immunity is not disclosed, it is obviously unable to obtain the complete picture to which it is entitled for a proper decision.

The indictment is replete with generalities and omissions. For example, paragraphs 13(a) and 19(a) charge the defendants and alleged co-conspirators with the use of "tactics" to impede and delay Southwest, but such tactics are not identified. It appears from the subsequent Bill of Particulars that various litigation, both administrative and judicial, and lobbying activities engaged in by defendants constitute improper conduct which presumably was brought to the grand jury's attention as acts in furtherance of the alleged conspiracy; however, the indictment makes no mention of lobbying or litigation, whether illegal or otherwise.

During oral argument it was brought to the attention of the Court that the antitrust division on February 3, 1977 had obtained an indictment in the District of Columbia against Pan-American World Airways, Inc. and others, filed as Criminal No. 77–00073,[7] an examination of which reveals

---

(b) Southwest was denied the opportunity to compete freely in the transportation of passengers by air among the major Texas cities;
(c) Competition generally in the transportation of passengers by air among the major Texas cities has been unreasonably and arbitrarily suppressed; and
(d) The public has been denied the benefits of free and open competition in the transportation of passengers by air among the major Texas cities.

6. *U.S. v. DeMarco*, 401 F.Supp. 505, 513 (C.D. Cal.1975)
*U.S. v. Morgan Drive Away, Inc.*, Crim. No. 697–73 (D.D.C.1973); 1974 Trade Cases 74,888, at 95,999 (D.D.C.1974)

*U.S. v. Hutcheson*, 32 F.Supp. 600 (E.D.Mo.), aff. 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941)
*U.S. v. Wayne Pump Co.*, 44 F.Supp. 949 (N.D. Ill., app. dis. 317 U.S. 200, 63 S.Ct. 191, 87 L.Ed. 184 (1942); *Smith v. U.S.*, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041

7. The following are pertinent excerpts from Crim. No. 77–00073:

. IV
NATURE OF TRADE AND COMMERCE
6. During the period 1971–1974, the United States had approximately 300,000 troops stationed in the FRG, based primarily in and around Frankfurt, Stuttgart, Nuremburg and Munich. Many military personnel on leave and

an utter contrast between the instant indictment and the charges of Sherman Act violations in that cause. Whether or not the Pan-American indictment may be valid

their dependents, at their personal discretion, traveled in international air transportation between the FRG and the United States. The transportation costs were borne by the individual traveler.

7. In the interest of the morale of the troops stationed in the FRG, the United States Department of Defense encouraged such travel trips between the FRG and the United States by United States military personnel on leave and their dependents.

8. During the period 1971–1974, Pan American, TWA and Lufthansa provided regularly scheduled nonstop or one-stop direct services in international air transportation between points in the FRG and points in the United States. United States military personnel on leave and their dependents wishing to take discretionary travel trips between the FRG and the United States would often use Pan American, TWA or Lufthansa to obtain the desired air transportation. Pan American, TWA and Lufthansa have provided the predominant share of international air transportation services to United States military personnel on leave and their dependents between the FRG and the United States.

9. Most international air transportation provided by scheduled air carriers is conducted pursuant to agreements executed between the United States and other nation states. These agreements are commonly entitled Air Transport Agreements. On July 7, 1955, the United States entered into an Air Transport Agreement with the FRG, which, as amended, was in effect in the period 1971–1974.

10. The Air Transport Agreement between the United States and the FRG allocates air routes among scheduled air carriers providing international air transportation between the United States and the FRG and establishes a mechanism for the setting of fares for such international air transportation.

11. In accordance with the Federal Aviation Act of 1958, as amended (hereinafter "the Act"), 49 U.S.C. § 1301 et seq., the Civil Aeronautics Board (hereinafter "the CAB" or "the Board") regulates some, but not all, aspects of international air transportation. For example, the CAB has the power, subject to veto by the President, to suspend and reject (but not prescribe) fares in international air transportation. 49 U.S.C. § 1482(j).

12. Section 1102 of the Act, 49 U.S.C. § 1502, requires that the CAB exercise and perform its powers and duties under the Act consistently with, inter alia, extant Air Transport Agreements.

13. To implement that part of an Air Transport Agreement which allocates routes among scheduled air carriers, the Board grants authority to operate in international air transportation to domestic air carriers by issuing, after notice and hearing, Certificates of Public Convenience and Necessity (Certificates) pursuant to Section 401 of the Act, 49 U.S.C. § 1371, and to foreign air carriers by issuing, after notice and hearing, Foreign Air Carrier Permits (Permits) pursuant to Section 402 of the Act, 49 U.S.C. § 1372.

14. At all pertinent times herein, Pan American and TWA were authorized by Certificates and Lufthansa was authorized by Permit to engage in international air transportation between a point or points in the United States, and a point or points in the FRG.

15. Article 11 of the Air Transport Agreement between the United States and the FRG establishes the mechanism for the setting of fares by scheduled air carriers providing international air transportation over routes covered by the Agreement. Fares may be set by scheduled air carriers either jointly or unilaterally. Joint fare setting may occur under the procedures of the International Air Transport Association (hereinafter IATA), a forum composed of member scheduled air carriers of different nations. If IATA procedures fail to result in an agreement which is approved by the governments of the IATA air carriers, or such procedures are otherwise not applicable, scheduled air carriers ordinarily must set fares unilaterally and propose such fares to the governments which are parties to the Air Transport Agreement. If either of the governments disapproves a fare, such fare must then be set through agreement between the governments which are parties to the Air Transport Agreement.

16. Under Section 412(a) of the Act, 49 U.S.C. § 1382(a), all intercarrier agreements "relating to the establishment of transportation rates, fares, charges, or classifications" must be filed with the Board. Section 412(b) of the Act, 49 U.S.C. § 1382(b), provides that the Board shall "disapprove any such contract or agreement . . . that it finds to be adverse to the public interest, or in violation of [the] chapter" and shall approve the rest. Under Section 414 of the Act, 49 U.S.C. § 1384, any person subject to a Board order approving an agreement under Section 412 are relieved from the operation of the "antitrust laws" (as designated in Section 1 of the Clayton Act, 15 U.S.C. § 12) "insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order."

17. IATA has established a Traffic Conference System for the negotiation and setting of fares by its member scheduled air carriers. This Traffic Conference System is organized according to three Traffic Conference Areas. Traffic Conference No. 1 (TC 1) encompasses, inter alia, the United States. Traffic Confer-

is unimportant; what is significant is that it is specific in its content, describing regu-

ence No. 2 (TC 2) encompasses, *inter alia*, all of Europe. Traffic Conference No. 3 (TC 3) encompasses, *inter alia*, all of Asia. Joint Traffic Conferences take action on matters affecting more than one Traffic Conference. Matters affecting both TC 1 and TC 2, such as international air transportation between the United States and the FRG, are dealt with by Joint Traffic Conference ½ (JT 12).

18. The Board, pursuant to Section 412 of the Act, has approved the IATA Traffic Conference System for the negotiation of international fares by member scheduled air carriers. Each fare agreement reached under IATA procedures must be submitted to the Board for approval under Section 412. Once such an agreement is approved by the Board, no person may be held liable for violation of the "antitrust laws" for doing anything authorized, approved, or required by the Board Order approving the agreement.

19. Since at least 1971, Pan American, TWA and Lufthansa have belonged to IATA and have participated in JT 12 Conferences.

20. Although many international air transportation fares are established under IATA procedures for joint fare setting, other international air transportation fares are established unilaterally by scheduled air carriers outside of IATA. Such independent fare setting may occur in response to the requirement or authorization of an individual government (hereinafter "government authorization") that a scheduled air carrier which is an IATA member provide a fare different from that which would otherwise be applicable under an extant IATA agreement.

21. Upon the filing of a government authorization with IATA pursuant to IATA Traffic Conference procedures, the scheduled air carrier in receipt of such authorization is relieved of any obligation to adhere to the IATA agreement to the extent necessary to honor the government authorization, and is free to set a fare which deviates from the agreed upon IATA fare. Once IATA receives notification of a government authorization, IATA disseminates the authorization to member scheduled air carriers, but IATA does not and cannot pass upon the validity of or otherwise approve or disapprove the authorization.

22. By law, agreements among scheduled air carriers to fix fares on traffic to or from the United States established pursuant to a government authorization violate Section 1 of the Sherman Act, 15 U.S.C. § 1, unless CAB approval pursuant to Section 412 of the Act is sought and received prior to establishment of the agreement.

23. As of June, 1971, IATA's JT 12 had established a fare for personal discretion travel by United States military personnel on leave and their dependents (hereinafter "IATA mili-

lation by the Civil Aeronautics Board of certain aspects of international air trans-

tary excursion fare"). In or about June of 1971, the United States Department of Defense issued government authorizations to several domestic scheduled air carriers including Pan American and TWA to institute fares lower than the IATA military excursion fare for personal discretion travel by United States military personnel on leave and their dependents. This government authorization did not suggest a fare level other than to suggest generally that the fare should be reduced.

24. In or about December/January, 1971–1972, Pan American transmitted the Department of Defense's government authorization to IATA pursuant to IATA Traffic Conference procedures, and implemented a fare outside of IATA, applicable for discretionary travel in international air transportation by United States military personnel on leave and their dependents between, *inter alia*, the FRG and the United States. This fare was lower than the IATA military excursion fare. TWA and Lufthansa shortly thereafter implemented matching fares. The non-IATA fare thus established is referred to hereinafter as the non-IATA military excursion fare.

25. In 1974, Pan American, TWA and Lufthansa derived approximately · the following revenues from sales to United States military personnel on leave and their dependents of international air transportation services between the United States and the FRG under the non-IATA military excursion fare: Pan American, $5 million; TWA, $7 million; Lufthansa, $3.8 million, for a total of approximately $15.8 million.

26. International air transportation of military personnel on leave and their dependents pursuant to the non-IATA military excursion fare between points in the FRG and points in the United States is in interstate and foreign commerce and affects interstate and foreign commerce.

## V
### OFFENSE CHARGED

27. Beginning sometime in 1972, the exact date being to the Grand Jurors unknown, and continuing up to and including December 20, 1974, the defendants and unnamed co-conspirators have engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate and foreign trade and commerce, *viz.* international air transportation of United States military personnel on leave and their dependents pursuant to the non-IATA military excursion fare between points in the FRG and points in the United States, a misdemeanor in violation of Section 1 of the Act of Congress of July 2, 1890, as amended prior to December 20, 1974 (15 U.S.C. § 1), commonly known as the Sherman Act.

28. The aforesaid combination and conspiracy has consisted of a continuing agreement,

portation, the extent of permissible price-fixing among airlines, the importance of interline agreements, and most significantly it sets forth the immunity afforded by Section 414 of the Act with respect to agreements which would otherwise be subject to Sherman Act violation. In particular under the paragraph designated "Offense Charged" the indictment accuses defendants of refraining from disclosing the existence of a certain agreement to the CAB, and refraining from obtaining the approval of that agency to establish and implement such agreement, understanding and concert of action between the defendants.

Were the details set out in the above indictment present in any measure in the indictment under consideration, with its references to Section 414 and its immunizing effect upon what would otherwise be Sherman Act violations, that would in the Court's mind fairly serve the defendants with knowledge of what the Government is charging, as well as letting the grand jury know what it should consider in determining whether or not the acts so charged fell within the scope of Section 414 and the three sections of the Aviation Act enumerated therein. Although the lack of specificity in the Braniff-Texas International indictment, together with the apparent failure of the government prosecutors to disclose the possibility of immunity under Section 414 may justify dismissal, it is unnecessary to strike the indictment on these grounds.

█ It is the opinion of the Court and the Court so finds that the conduct of the antitrust staff in presenting unsworn summaries and excerpts to the grand jury of testimony obtained from witnesses who testified before the first grand jury, and its accompanying failure to read from the transcript *in toto* the testimony received from such witnesses, taken in conjunction with the fact that no record was made by the court reporter of the summarized, excerpted and paraphrased testimony, constitutes an independent ground invalidating the indictment. The Court is further of the opinion and so finds that the employment, assignment, and appearance as an observer or as a prosecutor of Mr. Burton S. Kolko before the grand jury under the circumstances surrounding his former employment as a Civil Aeronautics Board official, constituted him an unauthorized person in the grand jury room during proceedings held in this case, and is an independent ground sufficient to vitiate the indictment.

In addition to the above express reasons for invalidating the indictment, the Court is

understanding and concert of action among the defendants and unnamed co-conspirators, the substantial terms of which have been to fix, raise, stabilize and maintain the price levels of the non-IATA military excursion fare between points in the FRG and points in the United States.

29. In furtherance of the aforesaid combination and conspiracy, the defendants and co-conspirators have done those things which they combined and conspired to do, including among other things,

(a) Engaged in communications with each other through meetings, telephone conversations, exchanges of telex messages and otherwise, regarding proposed alterations in the level of the non-IATA military excursion fare;

(b) Refrained from disclosing the existence of the aforesaid agreement, understanding and concert of action to the CAB;

(c) Refrained from obtaining the approval of the CAB to establish and implement the aforesaid agreement, understanding and concert of action; and

(d) Filed tariff revisions with the CAB which were the product of the aforesaid agreement, understanding and concert of action.

### VI
### EFFECTS

30. The aforesaid combination and conspiracy has had the following effects:

(a) The price for the non-IATA military excursion fare offered by scheduled air carriers to United States military personnel on leave and their dependents for travel between the FRG and the United States has been raised to and maintained at an artificial and noncompetitive level.

(b) United States military personnel on leave and their dependants have been deprived of the benefits of free and open competition in the non-IATA military excursion fare offered by scheduled air carriers for travel between the FRG and the United States.

(c) Price competition in the non-IATA military excursion fare offered by scheduled air carriers between the FRG and the United States, to U.S. military personnel on leave and their dependents has been restrained.

of the opinion and finds that under a totality of the circumstances surrounding and attendant upon this prosecution, the indictment should be set aside.

It is accordingly ORDERED that the indictment of Braniff Airways, Inc. and Texas International Airways, Inc. returned by the grand jury in this cause, be and the same is hereby in all things DISMISSED.