**UNITED STATES of America, Plaintiff,**

v.

**PHILLIPS PETROLEUM COMPANY,
Stanley Learned, William F. Martin,
William W. Keeler, Defendants.**

Crim. No. 76–CR–117–B.

United States District Court,
N. D. Oklahoma.

July 5, 1977.

Jack Cotton, David V. Capes, Thomas M. Atkinson, Dept. of Justice, Tax Division, Washington, D. C., Charles W. Muller, III, Asst. U. S. Atty., San Antonio, Tex., for U. S.

Boris Kostelanetz, John J. Tigue, Jr., Lawrence S. Feld, Kostelanetz & Ritholz, New York City, L. K. Smith, Reuben Davis, Boone, Ellison & Smith, Tulsa, Okl., Ed-

ward J. Fauss, Phillips Pet. Co., Bartlesville, Okl., for Phillips Pet. Co.

John M. Imel, Donald P. Moyers, Tulsa, Okl., for Stanley Learned.

Edward Bennett Williams, John L. Vardaman, Jr., Washington, D. C., for William F. Martin.

Richard B. McDermott, David McKinney, Boesche, McDermott & Eskridge, Tulsa, Okl., for William W. Keeler.

FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO DEFENDANTS' MOTION TO DISMISS THE INDICTMENT FOR ABUSE OF THE GRAND JURY

BARROW, Chief Judge.

The Court having heard the arguments of counsel and received evidence on the Motion to Dismiss the Indictment for Abuse of the Grand Jury, and the parties having submitted their briefs, the Court, having carefully perused the entire file, including segments of the Grand Jury transcript, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On September 2, 1976, an indictment was filed in this Court, Case No. 76–CR–117, and naming as defendants Phillips Petroleum Company, Stanley Learned, William F. Martin and William W. Keeler.

2. A summary of Count I of the indictment is found in Finding No. 2 of the Findings of Fact and Conclusions of Law with respect to the Motion to Dismiss Count I for Breach of the Plea Agreement.

3. Counts II, III and IV of the indictment charge violations of 26 U.S.C. § 7206(2) in that William F. Martin did willfully and knowingly aid and assist in, and counsel, procure, and advise the preparation and presentation to the Internal Revenue Service of a corporate income tax return filed in the name of Phillips Petroleum Company which was false and fraudulent in that commission income paid by Triton Shipping Company to and for the use and benefit of Phillips Petroleum Company was omitted from and unreported in said returns, when the said Defendant well knew and believed Phillips had commission income from Triton. Such acts are charged: in Count II, on or about September 16, 1970, in regard to commission income in the amount of $146,977.10, for the calendar year 1969; in Count III, on or about September 1, 1971, in regard to commission income in the amount of $98,285.00, for the calendar year 1970; in Count IV, on or about September 15, 1972, in regard to commission income in the amount of $104,077.95, for the calendar year 1971.

4. Counts V, VI and VII of the indictment charge Phillips Petroleum Company with violations of 26 U.S.C. § 7206(1) in that the Company made and subscribed United States Income Tax Returns for Phillips which were verified by a written declaration that they were made under penalties of perjury, and filed with the IRS which the Corporation did not believe to be true and correct as to the material matters in that the return failed to report commission income and technical service fee income, which the Defendant well knew and believed had been received. Such acts are charged: in Count V, on or about September 16, 1970, for the calendar year 1969, in regard to unreported commission income in the amount of $146,977.10, paid by Triton Shipping Company and technical service fee income in the amount of $440,000.00, from Cochin Refineries, Ltd.; in Count VI, on or about September 1, 1971, for the calendar year 1970, in regard to unreported commission income in the amount of $98,285.00, paid by Triton Shipping Company and technical service fee income in the amount of $440,000.00, from Cochin Refineries, Ltd.; in Count VII, on or about September 15, 1972, for calendar year 1971, in regard to unreported commission income in the amount of $104,077.95, paid by Triton Shipping Company, and technical service fee income in the amount of $440,000.00 from Cochin Refineries, Ltd.

5. All defendants have moved that the indictment in this case be dismissed on the basis of abuse of the Grand Jury.

6. One such alleged abuse is that the prosecutors withheld from the Grand Jury exculpatory evidence which was obtained from the Grand Jury witness, James R. Akright. The evidence withheld consists of the evening recorded testimony of Akright given to U. S. Justice Department Special Prosecutors Messrs. Charles Muller (formerly with the Department of Justice) and Thomas Atkinson and IRS Special Agent, John Gillette, without the presence of the Grand Jury. Defendants contend that this testimony which was withheld from the Grand Jury was exculpatory and explanatory of a remark which Akright had made earlier the same day within the presence of the Grand Jurors.

The Court became aware of the evening testimony of Akright during the hearing of the Defendants' Motion to Dismiss the Indictment for Abuse of the Grand Jury of February 15, 1977. The record shows that the Court—and defense counsel—became aware of the alleged abuse almost inadvertently:

"MR. WILLIAMS: . . . We have pursuant to Your Honor's order been given the Grand Jury testimony of the witnesses save the Internal Revenue agent who testified at the end. One of those witnesses was a lawyer for the Phillips Company, named Akright. Akright testified. First of all he testified before Your Honor had conferred immunity on him, and he refused and then he was given immunity and he testified all one afternoon, specifically on the afternoon of February 12, just almost a year ago, and three days more than a year ago, and then, Your Honor, he gave evidence at night. The Grand Jury was allowed to go home and I am not sure of these facts so I have to recite to you, I believe them to be true, but I believe that Mr. Akright's lawyer wanted to get back to his home base and he asked the prosecutors to go forward at night and they acceded, but when they did the following happened. They said to the witness this: 'All right, Mr. Akright'—and this is on the evening of February 12th, '76—'for the record, for the record, this is Mr.

Muller speaking, this is a continuation of Mr. Akright's Grand Jury testimony by agreement between his counsel, Mr. Martin and myself, Mr. Muller. This will be considered part of the Grand Jury records and will be under the same conditions of use immunity we have previously extended through order of the Court.'

So, we go on and we read that this continuation of the Grand Jury testimony went on with an agent of the IRS conducting a substantial part of the interrogation of the witness and with the witness' lawyer present. Two unauthorized persons. Certainly the secrecy of the Grand Jury completely and totally invaded.

THE COURT: Let me make for sure you are saying that this testimony is before the Grand Jury at night?

MR. WILLIAMS: No. What they did, Your Honor, as I understand it, is they said, 'This is a continuation, Mr. Witness, of your Grand Jury testimony.' All right. And all the same rules obtain, he was under oath and he had testified all afternoon. But then in the continuation of his Grand Jury testimony there were present Mr. Martin, the witness' lawyer, Mr. Muller, [Government attorney], Mr. Gillette of the IRS and the court reporter. And Mr. Gillette participates in a substantial portion of the interrogation of the witness as shown in the record here.

Now, I say this to Your Honor because I think you have here the tip of the iceberg. The tip of the iceberg being indicative of the fact that throughout these proceedings by virtue of the nature of the proceedings that were being conducted, namely the subversion of a Grand Jury to the use an [sic] agency of the Executive Branch of Government, that the evidence before the Grand Jury was on a regular basis made available to [IRS] Agents Talley and Gillette in contravention of Your Honor's order of August 28, 1975, and in contravention, Your Honor, of the rules of secrecy that historically safeguard Grand Jury proceedings under Rule 6(e) of the Federal Rules of Crimi-

nal Procedure and under the case law that has surrounded the Constitution of the United States from its inception insofar as Grand Jury proceedings are concerned.

THE COURT: Let me say this is the first time that has ever been called to my attention, that this occurred, first of all on the immunity, granted Mr. Akright was before the Grand Jury.

MR. WILLIAMS: It is the first time, Your Honor. I would have called it to your attention the moment it came to my attention but it didn't come to my attention until I got this Akright testimony, I would say 96 hours ago, because this testimony was not turned over to us until we requested it. All of the other testimony was turned over to us, of all of the witnesses, I believe, except the IRS agent who testified; and it was quite clear from the Akright testimony that there had been a continuation of it and when it was turned over to us it became apparent to us that it had taken place at night, it had taken place as part of the Grand Jury proceedings but without the Grand Jury and that the interrogation had been run by an IRS agent, named Gillette, in substantial part and that it had been run in the presence of two unauthorized persons, Mr. John Martin and Mr. John Gillette." [Proceedings of February 15, 1977, Tr. 42–45].

7. The Court finds that the facts surrounding this alleged abuse of the Grand Jury are as follows:

8. The technical service fees referred to in Counts I, V, VI and VII of the indictment were paid by Cochin Refineries, Ltd. (CRL), a refinery in southern India which is partially owned by Phillips. They were paid pursuant to the Technical Services Agreement dated September 28, 1963, between Cochin Refineries and Phillips Petroleum Company (Phillips). The terms of the Technical Services Agreement were that CRL was to pay Phillips substantial fees in United States dollars over a period of fifteen years in the following amounts [Section 3.3 of the Technical Services Agreement]:

"3.3  *Technical Service Fee for Services and Research Outside India.*  For technical service, including technical achievements and experience and for further technical developments and research during the term of this agreement, conducted outside India, all relating to refinery operations, the Company [Cochin] shall pay to Phillips a technical service fee as follows:

(a) 110,000 U.S. Dollars per quarter for the first five years from the date of commissioning of the refinery;

(b) 100,000 U.S. Dollars per quarter for a further period of five years subsequent to the first five years period; and

(c) 90,000 U.S. Dollars per quarter for the next five years subsequent to the period specified in (b) above."

[Technical Services Agreement, Section 3.3, Government's Brief in Proceedings Relative to Defendants' Motion for Reconsideration of this Court's Order of April 13, 1977, Exh. A—hereinafter referred to as Technical Services Agreement.].

9. Section 3.3 of the Technical Services Agreement makes the fees payable to Phillips. The Grand Jury heard substantial testimony relating to the Technical Services Agreement and Section 3.3 thereof.

10. Section 8 of the Technical Services Agreement specifically provided that Phillips could assign the agreement or the rights and obligations thereunder to Phillips Petroleum International Corporation, Panama (PPIC), a Panamanian subsidiary of Phillips. Pursuant to the instructions of Phillips, CRL paid the fees to PPIC.

11. The Government took the position through its questioning and in marshalling the evidence for the Grand Jury that the technical service fees should have been paid to Phillips Petroleum Company in the United States rather than to PPIC in Panama. [Proceedings of September 12, 1976, Tr. 39–42]. The Government contends that Phillips never properly assigned the Technical Services Agreement to PPIC, and that since

the agreement was between Phillips and CRL, the fees should have been paid to Phillips, recorded on the Phillips books in the United States and reported on the Phillips tax return.

12. The defendants take the position that Phillips instructed CRL to pay the fees to PPIC and that since PPIC had no United States source income, the fees were not subject to United States income tax. For tax purposes, the income of PPIC was not required to be consolidated with that of its parent, Phillips. Thus the technical service fees paid to PPIC were not included on the United States corporate income tax returns of Phillips.

13. The witnesses who testified before the Grand Jury on the issue of technical service fees indicated that James R. Akright, the Assistant Comptroller of Phillips since 1969, was the person chiefly responsible for the tax aspects of the technical service fees. Evidence had been presented to the effect that Akright was responsible for determining that the technical service fees should be paid to PPIC, that he was responsible for determining the tax consequences flowing from the payment of the fees, and that he was responsible for preparing an assignment if the fees were to be paid to PPIC. There was also testimony that two people had raised a question with Akright as to whether the fees had been assigned to PPIC and Akright assured them that he would make sure that the proper documentation was made.

14. James R. Akright, subpoenaed to testify before the Grand Jury appeared on February 12, 1976, but refused to testify, claiming the fifth amendment protection against self-incrimination. Subsequently, Akright was granted use immunity that same day by this Court, pursuant to 18 U.S.C. § 6002, and was ordered to testify or provide other information to the Grand Jury. [Order filed February 12, 1976].

15. The witness Akright testified before the Grand Jury on Thursday, February 12, 1976, pursuant to the grant of use immunity ordered by the Court.

16. Akright testified that the person who prepared the Phillips tax return was under his supervision and that the preparation of tax returns was his specialty. Akright was asked a number of questions concerning the existence of an assignment of the fees from Phillips to PPIC. [Grand Jury proceedings of February 12, 1976, Tr. 95–96; 104]. Akright testified that he discussed with one person, Simmons, whether or not there was an assignment, that he looked for an assignment, and that he was unable to find one. [Id., Tr. 96; 103–04]. Akright further testified that he reported back to Simmons that he was unable to find an assignment. When asked specifically what he told Simmons, Akright said that he rendered legal advice to him pertaining to taxes. However, when asked the substance of that advice, he asserted the attorney-client privilege.

17. At the end of the afternoon Grand Jury testimony of Akright, the following exchange occurred:

"QUESTION: Would you give me your opinion presently, right now, as to whether or not the outside tech service fees were taxable to Phillips Petroleum Company when received by Phillips Petroleum International Corporation?

A. It would be my opinion that if there was an assignment of the tech service fees outside of India, the contract, it would be taxable to PPIC. Now, if there was no assignment, it would be taxable to Phillips Petroleum Company."

[Grand Jury proceedings of February 12, 1976, Tr. 123–24].

18. At the conclusion of Akright's testimony that afternoon, Mr. Muller (a former) Department of Justice attorney assigned to this case during the Grand Jury proceedings, requested that Mr. Akright "return for just a short period in the morning." Instead of leaving to return the next day, Mr. Akright stayed late for questioning to be continued as stated herein. [Id., Tr. 124].

19. Mr. Akright, accompanied by his attorney, Mr. John Martin, gave recorded testimony to the Department of Justice attor-

neys, Messrs. Muller and Atkinson, and an Internal Revenue agent, John Gillette, at the Federal Building on the night of February 12, 1976 from 7:15 to 8:30 p.m. [Def. Exh. 6].

20. Participating in the examination of Akright was Mr. Gillette, the Special Agent of the Internal Revenue Service. [Def. Exh. 6]. At the beginning of the evening testimony, Mr. Muller told Mr. Akright:

"All right, for the record, this is a continuation of Mr. Akright's grand jury testimony by agreement between his counsel, Mr. MARTIN, and myself, Mr. MULLER. This will be considered part of the grand jury records and will be under the same conditions of use immunity we have previously extended through order of the Court."

[Def. Exh. 6 at 11].

21. At this very point, the entire Grand Jury proceedings became fatally defective. This portion of the Grand Jury proceedings took place in the evening after the Grand Jury had been excused for the day, there were two unauthorized persons present during the continuation of Akright's Grand Jury testimony—Messrs. Martin and Gillette—and Gillette actively participated in the interrogation of Akright. [Def. Exh. 6 at 1; 4; 9–11; 16–19].

22. The Court finds that the circumstances surrounding the taking of the evening testimony of Akright are in themselves an abuse of the Grand Jury, albeit an inadvertent error on the part of Messrs. Muller and Atkinson. Any error that was committed was certainly unintentional on their part because the Court regards these two men to be of the highest moral and professional character. Yet the Court cannot close its eyes to the fact that this evening session was irregular, to say the least, and a fatal defect in the Grand Jury proceedings.

23. In addition to causing the above irregularities [see Finding No. 21], the evening testimony of Akright is most important for another reason. During the course of this examination, Mr. Muller reviewed with Mr. Akright his testimony that the fees were taxable to Phillips if there was no assignment, that he knew that there was no assignment, and that he knew that the fees were not reported on Phillips' federal income tax returns [Def. Exh. 6 at 15]. Muller then asked the *crucial question* which he had not asked when Akright was before the Grand Jurors. He asked Akright *why* the fees were not reported on Phillips' income tax returns. [Def. Exh. 6 at 15]. *Akright said*:

"You will recall that you have told me that I knew at the time that the payments were being made to PPIC—the money was being paid into Panama. And here is a foreign corporation of substantial government participation making payments to a particular corporation under a contract presumably calling for services. Why was that done? To me, there is the possibility under these circumstances of there being an assignment—informal though it be—because its appointees acted as if there had been an assignment. *Now, in the face of inability to find a formal assignment, I think you will appreciate I was in somewhat of a qaundry. To the best of my knowledge, I took no action, and it would have taken action by me to change the financial records. Now, in retrospect, obviously, I should have been more careful. The only thing I can see—and this is no excuse, mind you—the item you're talking about was relatively insignificant to me at that time.* We had a problem in India involving several million dollars in taxes—the withholding problem. Not only substantial taxes directly on—on the withholding—potential penalties of 100 percent plus 9 percent interest—neither of which, once assessed, could be withheld. *So I'll have to say that within the context of the time and the events, the item that you are focusing on was not all that important to me. Now, I'll have to admit to you, it should have been, in retrospect, when you take it out of context and focus on it. But frankly, it was not.*"

[Def. Exh. 6 at 15–16, emphasis supplied].

24. The Government admits that, except for a portion of Akright's evening testimony which was repetitive of testimony previously given in the presence of the Grand Jurors, nothing said during the evening session was put before the Grand Jury. [Proceedings of February 15, 1977, Tr. 73; 77; 81]. The one instance in which there was a reference to Mr. Akright's testimony occurred during the testimony of IRS Special Agent Gillette on September 2, 1976. Gillette had received documents and transcribed Grand Jury testimony to analyze, as an assistant to Messrs. Muller and Atkinson, Special Attorneys for the Department of Justice. He was testifying as to having marshalled the evidence for the Grand Jury's consideration [Grand Jury Proceedings of September 2, 1976, Tr. 18–19]. The Grand Jury's attention was directed to, and the Grand Jury was asked to recall, Akright's earlier testimony before it as follows:

"Q. [by Mr. Muller] . . . [H]e [Mr. Simmons] had asked Mr. Akright, remember, and Mr. Akright said, testified subsequently, Mr. Gillette, the testimony was taken, Mr. Akright acknowledged that he had in fact done a search for an assignment, did he not?

A. [Gillette] Yes, sir, that's correct.

Q. And what was the result of his search?

A. He had not found an assignment, sir.

[Grand Jury Proceedings of September 2, 1976, Tr. 39–40].

This exact testimony had been given by Mr. Akright on February 12, 1976 [Grand Jury Proceedings of February 12, 1976, Tr. 104]:

Q. [Muller]—alright. And did you remember also to render to him [Mr. Simmons] and tell him the results of your search?

A. [Akright] Yes.

Q. What did you tell him with regard to the results of your search?

A. That I had not found a *formal* assignment.

25. However, Akright's testimony during the evening of February 12, 1976 [Def. Exh. 6] contains the explanatory statement of his failure to act upon his knowledge that there was no formal assignment [see Finding No. 23]. Having reviewed the Grand Jury transcript, the Court finds that this explanatory statement was not placed before the Grand Jurors for their consideration.

26. At no time did the attorneys for the Government or Gillette of the IRS disclose to the Grand Jurors the critical testimony of Akright given on the evening of February 12, 1976, where he attributed the failure to report the fees or to assign them to PPIC to his carelessness. Nor did the attorneys have Mr. Akright return to so testify before the Grand Jury nor did they explain his absence to the Grand Jurors. Instead of providing the Grand Jury with Akright's explanation as to why the fees were paid to PPIC despite the lack of an assignment, the apparent impression was left in the minds of the Grand Jurors of a deliberate and intentional refusal to assign the fees to PPIC. This is particularly significant since the Grand Jurors had manifested, through their substantial questioning of witnesses, a deep interest in the technical service fees. [See Grand Jury Proceedings Transcripts of September 10, November 5, and November 6, 1975]. There is no way for this Court to look into the minds of the Grand Jurors to attempt to ascertain what they would have done had they had this explanatory statement before them, nor will it ever be known. This is an instance where not even hindsight is the best sight.

27. Therefore, the Court finds, having reviewed at length the Grand Jury transcript, and excerpts submitted by counsel for both the defense and the Government with regard to the technical service fees issue, that the remark by Akright during the evening session explaining *why* he did nothing when he found no evidence of an assignment to PPIC, was in fact exculpatory as being inconsistent with an intentional, wrongful failure on the part of Phillips to report the fees as income, and, as such, should have been placed before the Grand Jurors.

28. The Court finds that the failure to place this exculpatory remark before the Grand Jurors for their consideration was an abuse of the Grand Jury, even though the Court does not feel that this was an intentional error on the part of the attorneys for the Department of Justice, or the IRS agent, Gillette.

29. Since the Court finds that there was an abuse of the Grand Jury, both in the irregularities of the evening session and the failure to place the exculpatory remark of Akright before the Grand Jurors, such abuse taints the entire indictment and the entire indictment must be dismissed.

30. The Court finds that it is unnecessary at this time to rule on the question of whether or not the Grand Jury investigation in this matter was conducted as an "open-ended" Grand Jury (although there is evidence to support such allegation) since the Findings of Fact in relation to the Akright testimony and the abuses surrounding it make the procedure fatal and require dismissal of the entire indictment.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, the Court makes the following Conclusions of Law:

1. The slightest intrusion of an unauthorized person into a Grand Jury proceeding voids the indictment, even absent a showing of prejudice. *Latham v. United States*, 226 F. 420, 424 (5th Cir. 1915); *United States v. Bowdach*, 324 F.Supp. 123, 124 (S.D.Fla.1971); *United States v. Borys*, 169 F.Supp. 366, 367 (D.Alaska 1959); *United States v. Carper*, 116 F.Supp. 817, 820 (D.D. C.1953); *United States v. Amazon Industrial Chemical Corp.*, 55 F.2d 254, 261–62 (D.Md.1931); *United States v. Rosenthal*, 121 F. 862, 873 (S.D.N.Y.1903); *United States v. Edgerton*, 80 F. 374 (D.Mont.1897).

2. While it is true that the testimony of James R. Akright was taken outside the actual presence of the Grand Jurors, nonetheless, the Government is bound by Mr. Muller's characterization and representation that evening session was "a continua-tion of Mr. AKRIGHT's grand jury testimony" and it "will be considered part of the grand jury records." No matter how well motivated the Government attorneys may have been, the evening session was an irregularity which made the Grand Jury proceedings defective. Additionally, the fact that two unauthorized persons were present in the room, one of whom conducted a portion of the questioning of the witness, is sufficient in itself to void the indictment.

3. It is important to the proper functioning of the Grand Jury that it be apprised of the essential information which will allow it to make an informed and independent judgment as to whether it is appropriate to return an indictment in a given case. *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579 (W.D.Tex.1977); *United States v. DeMarco*, 401 F.Supp. 505 (C.D. Cal.1975), aff'd, 550 F.2d 1224 (9th Cir. 1977); *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); *Johnson v. Superior Court*, 38 Cal.App.3d 977, 113 Cal.Rptr. 740 (1974), aff'd, 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792 (1975). As the Supreme Court said in *United States v. Dionisio*, 410 U.S. 1, 16–17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973), the mission of the Grand Jury *"is to clear the innocent, no less than to bring to trial those who may be guilty."* (emphasis supplied and footnote omitted). A requirement that the prosecutor disclose evidence which he knows will tend to negate guilt is consistent not only with *United States v. Braniff Airways, Inc.*, supra, *United States v. DeMarco*, supra, and *Johnson v. Superior Court*, supra, but also with ethical standards espoused by the American Bar Association. The American Bar Association Standards, Section 3.6(b) of "The Prosecution Function", provide that:

> "The prosecutor should disclose to the grand jury any evidence which he knows will tend to negate guilt."

The commentary to that section provides in part:

> "A prosecutor should present to the grand jury evidence which would reasonably tend to negate the guilt of the ac-

cused. . . . The obligation to present evidence which tends to negate the guilt of the accused flows from the basic duty of the prosecutor to seek a just result." ABA Standards, "The Prosecution Function" at 89.

4. In the case of *United States v. De-Marco*, 401 F.Supp. 505 (C.D.Cal.1975), *aff'd*, 550 F.2d 1224 (9th Cir. 1977), the defendant was first indicted in the District of Columbia for three offenses. When he sought a change of venue to California, his lawyer was told by the prosecutor that if DeMarco successfully transferred the case to California, the Government would re-indict on different charges. When DeMarco obtained a change of venue, a subsequent indictment was returned in California. The Grand Jury that returned the second indictment was not told of the first indictment nor was it told that the Government was seeking the second indictment because De-Marco had obtained a change of venue on the District of Columbia indictment.

DeMarco moved to dismiss the second indictment on two grounds: (1) that it was sought by the Government in retaliation for the exercise of a right to a change of venue on the first indictment and (2) that the Grand Jury was not told of the reasons for seeking the second indictment. The District Court agreed that the indictment must be dismissed on both grounds. As to the second ground it said:

"the prosecutor did not disclose to the grand jury that the charge could be attacked as an unjustifiable exercise of the charging power. *The grand jury was entitled to be apprised of that information so that it could make an independent judgment as to whether it was appropriate to return an indictment under the circumstances.*" 401 F.Supp. at 513 (Emphasis supplied).

■ The rule enunciated in *DeMarco* is equally applicable in this case, that is, the Grand Jury was entitled to be apprised of the exculpatory information so that it could make an independent judgment as to whether it was appropriate to return an indictment under the circumstances.

■ 5. Important to the District Court's decision in *DeMarco* was the Supreme Court's opinion in *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), which spoke of the necessity to have an "independent and informed grand jury." Guided by that principle, the District Court in *DeMarco* concluded that the second indictment should be dismissed because "the government did not present information vital to the grand jury's informed and independent judgment." 401 F.Supp. at 514. This Court concludes that the District Court's decision in *DeMarco* is consistent with the American Bar Association's Standards [see Conclusion No. 3], and consistent with the Court's ruling in this case. This case presents an extreme example of the Government withholding from the Grand Jurors testimony which, by the prosecutor's own words, was a part of the Grand Jury testimony of the witness Akright, and a "part of the grand jury records. . . ." The Akright testimony bore directly upon a key question raised before the Grand Jury—whether the technical service fee income was intentionally and wrongfully excluded from the Phillips' tax returns. Moreover the excluded testimony was necessary to place in context Akright's earlier testimony on this point which, as it was left with the Grand Jurors, appeared quite damaging to the defendants. Because the Grand Jurors were deprived of Akright's explanation, in which he attributed the failure of the Company to take any required remedial action to his own oversight and carelessness, they did not have essential evidence to determine whether the failure to report the technical service income was sufficiently intentional or wrongful to support a criminal charge.[1] The Court concludes

---

1. Akright's answer clearly tended to negate the elements of "bad purpose" or "evil intention" which are necessary to an indictment and conviction under 26 U.S.C. § 7206. In order to establish a criminal violation the Government must prove bad faith or evil intention. *United States v. Bishop*, 412 U.S. 346, 360, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973). As the Court of Appeals for the Ninth Circuit recently observed, a jury may not convict for a criminal

**620**

that this is an independent abuse of the Grand Jury which must result in the dismissal of the entire indictment.[2]

■ Once the prosecutors obtained the exculpatory testimony from Akright, they were not free to ignore it. They were clearly under a legal and ethical obligation to present it to the Grand Jury regardless of whether it tended to exculpate individuals or a corporation. As this Court observed in its Order of April 13, 1977, if the testimony is exculpatory, it is mandatory that it should have been placed before the Grand Jurors. In so holding this Court relied upon *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579 (W.D.Tex.1977) and the cases cited in that decision. See also *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); *United States v. DeMarco*, 401 F.Supp. 505 (C.D. Cal.1975), aff'd, 550 F.2d 1224 (9th Cir. 1977); *Johnson v. Superior Court*, 38 Cal. App.3d 977, 113 Cal.Rptr. 740 (1974), aff'd, 15 Cal.3d 248, 124 Cal.Rptr. 32, 539 P.2d 792 (1975).

■ The failure to provide the Akright evening testimony to the Grand Jury was a serious abuse of the Grand Jury. Had the Grand Jurors heard Akright attribute the failure either to report the fees or to assign them to PPIC to his carelessness, it is quite likely that the indictment now before the Court would never have been returned. The failure to submit the Akright testimony to the Grand Jury requires the dismissal of not only those counts which specifically mention the technical service fees, Counts I and V–VII, but also of the entire indictment since withholding of that exculpatory testimony constitutes a serious abuse of the Grand Jury.

■ 6. Further, in this case, the failure to provide the Akright evening testimony to the Grand Jurors was also a serious breach of the defendants' right to due process of law. The picture which emerged from Akright's afternoon testimony was one of deliberate and wrongful failure to report the technical service fee income on the Company's tax returns. Akright first refused to testify on this subject on the ground that his testimony might be incriminating. After being forced to testify through a grant of immunity, he established himself as an expert on federal income tax and the officer primarily responsible for the Company's tax returns. He then told the Grand Jurors that absent an assignment of the technical service fees to PPIC, those fees should have been reported on the Phillips Tax returns. He said he looked for such an assignment but was unable to find one. He then gave tax advice to an assistant comptroller; however, when asked what that advice was, he asserted the attorney-client privilege. The Grand Jurors must have inferred that the advice he gave was the same which he had given before the Grand Jurors—if there was no assignment, the fees should be reported. Although Akright was asked in the presence of the Grand Jury to return the next day, he did not do so. The Grand Jurors never learned why, and never had a chance to ask him questions of their own concerning the technical service fees.

tax violation on the basis of "negligence, bona fide mistake, *carelessness* or misunderstanding." *United States v. Colacurcio*, 514 F.2d 1, 8 (9th Cir. 1975) (emphasis supplied). Clearly, if the grand jurors had heard and accepted Akright's evening testimony in which he attributed his failure to act to carelessness, they might well have found the requisite degree of intent to sustain a criminal conviction missing.

**2.** Several courts have held that there is no requirement that a prosecutor submit *all* exculpatory evidence to a Grand Jury. *Loraine v. United States*, 396 F.2d 335 (9th Cir.), *cert. denied*, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968) (prosecutor not required to tell

grand jury that certain witnesses that appeared before it had criminal records and were under indictment); *United States v. Mandel*, 415 F.Supp. 1033 (D.Md.1976) (no error for prosecutor to fail to call witnesses that may have exculpatory evidence where defendants had refused invitation to give government a list of witnesses who had exculpatory information). In neither of those cases, however, did the prosecutor keep from the grand jurors *favorable, exculpatory* testimony from a witness who had already testified—particularly not where the exculpatory testimony was, in the prosecutor's words, "part of the grand jury's records."

In the evening testimony Akright was asked why Phillips did not cause the fees to be reported. He explained that it was his responsibility to report the fees or to prepare an assignment and the failure to do so was due, not to an intent to evade taxes, but rather to oversight and carelessness. Had the Grand Jurors heard that testimony, the effect of Akright's afternoon testimony as well as that of other witnesses might well have been dissipated. Clearly the explanation offered in the evening was necessary for the Grand Jurors to have a full understanding of the failure to report those fees or to assign them to PPIC.

The Court cannot accept the Government's position as stated in the argument on this matter that the prosecutor "is under no obligation whatsoever to give exculpatory testimony to the Grand Jury. . . ."[3] The Court need not consider whether in every case in which a prosecutor obtains exculpatory evidence he is obligated to present it to the Grand Jury. The Court does conclude, however, that where, in the circumstances of this case, a witness appeared before the Grand Jury and gave testimony which, in the absence of explanation, must have been considered incriminating, and subsequently, in recorded testimony before the prosecutor, gave an exculpatory explanation, it is a violation of due process and an abuse of the Grand Jury to withhold that testimony from the Grand Jury. Without such a requirement, the Grand Jury cannot "clear the innocent" and "serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor . . . ." *United States v. Dionisio, supra,* 410 U.S. at 16–17, 93 S.Ct. at 773. In a case very similar to this one, in which exculpatory testimony was withheld from a Grand Jury, the California Court of Appeals stated:

> "In the actual trial of guilt, a district attorney need not produce evidence favorable to the accused, for the adversary system expects the defense to do so. [citation omitted] The prosecutor is under

a duty, nevertheless, not to conceal or suppress evidence negating guilt; his intentional suppression of material evidence denies a fair trial; under many circumstances he must disclose exculpatory evidence even without a request. [citation omitted] When these factors are transported into the nonadversary realm of the grand jury, the prosecutor's disclosure obligation takes on a new dimension. Any prospect of exculpation from another source virtually disappears; if the prosecutor does not produce the evidence, no one will. The grand jury can perform its central function as the independent adjudicator of probable cause only if the prosecutor's duty extends beyond avoidance of suppression and includes an affirmative obligation to produce evidence in his possession or control which tends to negate guilt. [citation omitted.]

"These considerations require the postulation of a rule which may be articulated as follows: The grand jury's ability to safeguard accused persons against felony charges which it believes unfounded is an attribute of due process of law inherent in the grand jury proceeding; this attribute exists for the protection of persons accused of crime before the grand jury, which is to say that it is a 'constitutional right;' any prosecutorial manipulation which substantially impairs the grand jury's ability to reject charges which it may believe unfounded is an invasion of the defendant's constitutional right. Although self-restraint and fairness the exception, the inner core of due process must be effectively recognized when the exception occurs. When the prosecutor manipulates the array of evidence to the point of depriving the grand jury of independence and impartiality, the courts should not hesitate to vindicate the demands of due process. (Cf. *United States v. Wells,* 9 Cir., 163 F. 313, 325; *Dong Haw v. Superior Court,* 81 Cal.App.2d 153, 160, 183 P.2d 724.)" *Johnson v. Sup. Ct. of California,* 38 Cal.App.3d 977, 113 Cal.Rptr. 740, 749–50 (1974), *aff'd on stat-*

**3.** Proceedings of February 16, 1977, Tr. 171.

**. 622**

*utory grounds,* 15 Cal.3d 248, 124 Cal. Rptr. 32, 539 P.2d 792 (1975).

■ Thus, because of the constitutional violation, as well as in the exercise of this Court's supervisory power over the Grand Jury, the Court concludes that, under the circumstances present in this case, the failure to provide the exculpatory evidence to the Grand Jury by the Special Prosecutor constitutes an abuse of the Grand Jury proceedings requiring dismissal of the indictment.

7. The totality of the circumstances in this case reflects a serious lack of appreciation of the historic functions and procedures of the Grand Jury and requires dismissal. In *United States v. Braniff Airways, Inc.,* 428 F.Supp. 579 (W.D.Tex.1977), the Court said, in dismissing the indictment, that it based its order "not only on particular grounds for dismissal set forth by the defendants, but also on the totality of the circumstances surrounding this prosecution." 428 F.Supp. at 580. See also *United States v. Fields,* No. 76–CR–1022–CSH (S.D.N.Y. June 2, 1977); *United States v. Litton Systems, Inc.,* No. 77–70–A (E.D.Va. May 25, 1977).

Therefore, this Court is of the opinion and concludes that, under the totality of the circumstances surrounding and attendant upon these grand jury abuses and this prosecution, the indictment must be dismissed. *United States v. Braniff Airways, Inc., supra.*

8. In the Conclusions of Law set forth immediately above, this Court has decided that the failure to provide the Akright exculpatory evidence constitutes an abuse of the Grand Jury requiring dismissal of the indictment. The defendants have made serious allegations that, as a separate and independent ground for dismissal of the indictment, an additional abuse of the Grand Jury was through the use of the Grand Jury as an "open-ended grand jury." The Court finds that there is evidence supporting the allegation of this abuse, [see Finding of Fact No. 30], but in view of the disposition by the Court of the dismissal of the indictment because of the manner in

which the evening testimony of Akright was taken and not presented to the Grand Jury, the Court concludes that it is unnecessary to pass on the alleged abuse of the Grand Jury because of its alleged use as an "open-ended grand jury."