UNITED STATES of America

v.

John E. McKENZIE, et al.

Crim. A. No. 81–281.

United States District Court,
E. D. Louisiana.

Sept. 10, 1981.

Michael D. Johnson, Stephen P. Clark, Linda L. Hagerty, Civ. Rights Div., Washington, D. C., Morris W. Reed, Asst. U. S. Atty., New Orleans, La., for plaintiff.

Ralph S. Whalen, Jr., New Orleans, La., for Dale Bonura, Stephen Farrar, Stephen Reboul and Ronald F. Brink.

Walter J. Rothschild, New Orleans, La., for Thomas Woodall, Richard LeBlanc.

Ralph Capitelli, New Orleans, La., for John E. McKenzie.

## ORDER AND REASONS; MOTION TO DISMISS INDICTMENT

DUPLANTIER, District Judge.

On November 8, 1980, while on duty, New Orleans Police Patrolman Gregory Neupert was shot to death. His body was found next to his police car parked near a public housing project in the Algiers area of New Orleans. There followed immediately an intensive investigation by the New Orleans Police Department to learn the identity of his murderers. On November 13, while police officers were engaged in an attempt to arrest three suspects, gun battles ensued, resulting in the death of the suspects. Three concurrent investigations into all of the circumstances were begun almost immediately, one by the New Orleans Police Department Internal Affairs Division, a second by the United States Department of Justice, Civil Rights Division and the New Orleans United States Attorney's office, with a federal grand jury, and a third by the District Attorney for the Parish of Orleans, with a local grand jury. These investigations concerned not only the events surrounding Neupert's murder and the subsequent killing of the three suspects, but also public allegations of police brutality al-

legedly occurring in the course of their efforts to apprehend whoever was responsible for Neupert's murder. On July 9, 1981, the federal grand jury returned an indictment containing numerous counts, all relating to alleged deprivation of the civil rights of various persons questioned by police following Neupert's murder. No indictment was returned related to the killing of the three suspects.

All seven defendants filed a motion to dismiss the indictment because of circumstances involved in the grand jury proceedings.

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury, . . ." Amendment V, Bill of Rights, United States Constitution.

As it has often done, the Supreme Court in *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974) emphasized the ancient role and solemn responsibilities of the grand jury:

> "The institution of the grand jury is deeply rooted in Anglo-American history. In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury.' *Cf. Costello v. United States*, 350 U.S. 359, 361–362 [, 76 S.Ct. 406 [407–408], 100 L.Ed. 397] (1956). The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions. *Branzburg v. Hayes*, 408 U.S. 665, 686–687 [, 92 S.Ct. 2646 [2659], 33 L.Ed.2d 626] (1972)." (Footnote omitted).

■ The Fifth Amendment guarantees an individual the right to be charged with a felony only by an indictment of an independent and unbiased grand jury. *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). As the Supreme Court stated in *Wood v. Georgia*, "[The grand jury] . . . has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused," 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). Nothing more or less is required than that an indictment be returned by a legally constituted and independent grand jury. *Costello v. United States, Id.* at 363, 79 S.Ct. at 408. In the absence of that independence, a grand jury no longer performs its vital function of protecting the rights of individuals but rather becomes the tool of the prosecutor. The fact that grand jury proceedings are secret, non-adversarial and almost totally under the control of the federal prosecutor magnifies this concern that the grand jury be independent. *United States v. Serubo*, 604 F.2d 807 (3d Cir. 1976); *United States v. Samango*, 607 F.2d 877, 883 (9th Cir. 1979).

Cognizant of the importance of the grand jury and concerned that grand juries should be properly guided in the performance of their duties, in 1978 the Judicial Conference of the United States approved a model grand jury charge for use by district courts throughout the nation. In the presence of government prosecutors, the grand jury which returned the indictment in this case was given that charge by the court. Reference is made hereafter to portions of the charge; two statements in the introductory part of the charge are pertinent here:

> "The duties with which you [as grand jurors] are charged are of the highest importance to the proper administration of justice."

> "The resolute independence of the grand jury came about only after considerable blood was shed and punishment meted out to our forebearers."

The Judicial Conference charge admonishes the members of the grand jury: "... you, in a very real sense, stand between the government and the accused." At issue here is whether activities of the government through its prosecuting attorneys have effectively prevented the grand jury from maintaining that "resolute independence" for which our forebearers' blood was shed, so that the grand jury could not "stand between the government and the accused."

■ In determining the validity of this indictment, the issue is not the good faith of the grand jury or of the prosecutors. Unintentional prosecutorial behavior can cause improper influence and usurp the role of the grand jury. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal ..." Justice Brandeis, dissenting in *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 573, 72 L.Ed. 944 (1928). Dismissal of an indictment on account of activities by prosecutors before the grand jury can be based either upon the constitutional rights of defendants under the Fifth Amendment or upon the court's inherent supervisory powers. In either case, the court's goal is to protect the integrity of the criminal justice system, "particularly the functions of the grand jury, from unfair or improper prosecutorial conduct." (Citations and footnotes omitted.) *United States v. Chanen*, 549 F.2d 1306, 1309 (9th Cir. 1977).

■ The court is mindful of the deference rightfully accorded to grand jury proceedings. *Beverly v. United States*, 468 F.2d 732 (5th Cir. 1972). As other courts have been in considering attacks upon indictments, we are reluctant to interfere with prosecutorial direction or to encroach on the independence of the grand jury. It is a close question whether this is one of those unusual cases in which an indictment must be dismissed to protect the constitutional rights of those indicted or the integrity of the judicial process. The line between the discharge by government attorneys of their responsibility to seek a grand jury indictment when in their opinion it is justified and abuse of the grand jury process is sometimes a thin and indistinct one. Nevertheless, after careful and thoughtful consideration of the transcript[1] of the grand jury proceedings the court is left with the firm conviction that that thin and indistinct line was crossed in this case.

■ The court dismisses this indictment both on constitutional grounds and under its duty to exercise supervisory power over grand jury proceedings.[2] We are convinced that the defendants have been denied their constitutional right not to be brought to trial except after a valid indictment. We are equally convinced that the integrity of the grand jury process must be protected from prosecutorial activity such as has occurred here. To refuse to dismiss this in-

1. Our analysis of prosecutors' activity is limited largely to the transcript of the last two days of grand jury proceedings immediately preceding the indictment. The government attorneys declined the court's repeated invitation to call the court's attention to any other part of the lengthy investigation they consider pertinent. Although controversy developed over the transcript, there is no basis for concluding that the transcript is not substantially accurate and complete. However, it would certainly be preferable if the proceedings were recorded electronically as well as by a court reporter, as is done in most trials. This could be especially helpful when more than one person is speaking at the same time, which occurs frequently in grand jury proceedings at critical stages and which did occur here. These exchanges were not and cannot be recorded by a court reporter alone. In response to the court's question as to whether he had a tape recording of the grand jury session, the official grand jury court reporter testified that no recording was made because "An electronic recording machine is not allowed in the grand jury room." In actuality, Rule 6(e)(1), F.R.Cr.P. specifically provides for the use of "an electronic recording device."

2. In those situations where it is necessary for the court to exercise its supervisory powers due to an abuse of the grand jury process, the existence of actual prejudice to the accused is unnecessary. See *United States v. Phillips Petroleum Co.*, 435 F.Supp. 610 (N.D.Okla.1977) where the court in its exercise of its supervisory powers, dismissed the entire indictment even though not all counts of the indictment were affected by government misconduct.

dictment would invite the repetition of such activity in future grand jury proceeding by signifying the court's approval thereof.

■ We have attempted to review all of the relevant jurisprudence, including those cases brought to our attention by counsel and those found through our independent research. We make no detailed analysis in this opinion of any of these cases because we have found, as did the court in *United States v. Chanen*, that "(a)lmost every court dealing with the issue raised here has confronted a novel set of facts." 549 F.2d 1307, 1309 (9th Cir. 1977). A review of these prior decisions reveals that although most courts have resisted dismissing indictments for prosecutorial activity before the grand jury,[3] other courts have not hesitated to dismiss indictments where the prosecutors' activities have warranted dismissal.[4] Not one of these prior decisions involves circumstances even remotely similar to the unusual and perhaps unique circumstances surrounding this indictment.

Among numerous such instances called to the court's attention by defendants' motion, we list here some of the improper actions by the prosecutors (there were two attorneys from the Justice Department, Civil Rights Division and one local Assistant U.S. Attorney present at almost all times). A number of these actions, standing alone, would not warrant judicial intervention. The totality cannot merit the stamp of judicial approval. The cumulative effect of the various activities of the prosecutors who appeared before the grand jury was to prevent the grand jury from performing its independent role.

As indicated above, the grand jury had engaged in an eight month pressure-packed investigation of public allegations that, following the murder of a local police officer in the course of duty, members of the New Orleans Police Department had brutalized numerous persons thought to have informa-tion about the murder and thereafter without justification had shot to death several persons suspected of the murder. The federal inquiry and the concurrent one by the local district attorney were the subject of almost daily media reports, often front page newspaper articles and lead news on radio and television. The exhibits in evidence in support of the defendants' pending motion for change of venue indicate the pressure under which the grand jury was working as it undertook its deliberations.

At the outset of the penultimate day of the grand jury proceedings the prosecutors engaged in repeated references to press reports and to suspected leaks to the press of confidential grand jury information. Moreover, the government attorneys made the grand jury a virtual battlefield in the war between themselves and the Orleans Parish District Attorney's office, a war in which the grand jurors were conscripted on the federal side, through repeated use by federal prosecutors of grand jury subpoenas and constant inuendo concerning the local district attorney. For example, there are several references to unsuccessful attempts to obtain information from the district attorney on an "exchange" basis or by subpoena. The inference is made that if the efforts had succeeded, the grand jury would have had additional support for an indictment. Of course, none of these comments by the prosecutors were evidence, nor did they serve any proper purpose.

After a U.S. District Judge had granted a motion to quash a government subpoena for production of state records, and again when the judge delayed enforcement of another subpoena directed to two investigators of the local district attorney, the prosecutors misled the grand jury by stating that appellate review "would substantially delay" the proceedings (Tr. 8); "This means that we wait a couple of months or forget about

---

3. See e. g. *United States v. Cederquist*, 641 F.2d 1347 (9th Cir. 1981); *United States v. Trass*, 644 F.2d 791 (9th Cir. 1981); *United States v. Chanen*, 549 F.2d 1306 (9th Cir. 1977).

4. See e. g. *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972); *United States v. Wells*, 163 F. 313 (D.Idaho 1908); *United States v. DeMarco*, 401 F.Supp. 505 (C.D.Cal.1975); *United States v. Phillips Petroleum Co.*, 435 F.Supp. 610 (N.D.Okl.1977); *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579 (W.D.Texas 1977).

their testimony." (Tr. 53). In fact, supervisory relief from the Fifth Circuit Court of Appeal was available in a much shorter period. With no suggestion of urgency by the government attorneys, the Fifth Circuit acted upon the local district attorney's appeal in 17 days. *In Re Muller* and *Clark*, No. 81–3405, July 27, 1981. Indeed, in similar situations supervisory relief is often granted within a few days.

At an early point during this session, (Tr. 25 and 26) the jurors discussed a visit by one or more of them to a cemetery, apparently agreed upon at a previous grand jury session. Some jurors considered the details of the scene significant in the determination of the credibility of a witness. Although it is clear that no juror should visit a scene and report his findings to the other jurors and that "evidence" concerning such a visit should not be considered or even discussed, apparently not one of the prosecuting attorneys called that to the attention of the grand jury. In effect, they permitted a grand juror to become a "witness."

On numerous occasions during the grand jury's final two days, several government attorneys repeatedly expressed to the grand jury their personal opinions as to the credibility of various witnesses and as to the weight and effect of the evidence which the grand jury had heard. A trial tactic uniformly condemned by courts and warranting reversal of a guilty verdict occurs when a prosecutor expresses to a jury his personal opinion on the merits of the case or the credibility of a witness. "It is particularly improper, even pernicious, for the prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for conviction of a criminal defendant." *United States v. Garza*, 608 F.2d 659 (5th Cir. 1979). We recognize that there is a myriad of prosecutorial conduct which is forbidden at trial yet is permitted before the grand jury. Certainly the very presentation of the indictment and supporting evidence informs the grand jury that the government attorneys are convinced that an indictment should be returned. A single statement by a prosecutor as to his personal opinion would not in itself invalidate an indictment. But what occurred in this regard before this grand jury cannot be countenanced. One of the Civil Rights Division attorneys gave a lengthy summary of the evidence, in which he included several references to his personal belief as to credibility of certain witnesses. The other then thanked the grand jury for its efforts in a rather personal manner: "We all think very highly of this group and the manner in which you have worked ..." (Tr. 137)[5] Thus one prosecutor had reviewed the evidence, explained the law, and urged an indictment. A second prosecutor had thanked the jury and praised them. Just before formal deliberation began, the third prosecutor, the local Assistant United States Attorney, not only added his own personal appeal but also that of the U.S. Attorney himself, Mr. Volz. (Tr. 159).

The indictment is signed John Volz, Stephen P. Clark, Michael D. Johnson, and Morris W. Reed. And, that would not have been—he would not have signed the indictment without a careful examination of all the evidence that has been presented to you and the relevant statutes involved that appear on the front of the indictment. And, he would not have signed the indictment had he not thought that the evidence—had he not thought that the evidence satisfied—that the evidence satisfied the elements of the statutes. ...[6]

5. These prosecutors invoked not only their personal status as government attorneys but also a personal "first name" relationship with the grand jury. They repeatedly refer to each other as "Morris", "Steve", and "Mike." See, e. g., Tr. 12, 21, and 23, 137. Not surprisingly, the grand jurors do likewise. "A Juror: 'Mike, he can give me a job.'" Tr. 21. "A Juror: ... Mike came and gave us the answer." Tr. 177.

6. There is no question about the impropriety of this statement concerning the United States Attorney's personal opinion as to the evidence. Also, there is serious doubt as to its accuracy. When Mr. Volz later is summoned from the "Brilab" trial, he makes it clear that he has not been with the grand jury "in a long time" and has had little time to devote to its investigation.

That goes for me, also.

One brief comment from me. And, please, if a question comes up about any evidence or anything that has taken place with the evidence and you want to see Mr. Volz, he is available to you ...

At this point the prosecutor permitted his zeal to overcome his obligation not to appeal to prejudice:

I would like to briefly say that everyone would like to think that our police officers are performing their duties and performing the duties according to the law. We certainly hate to see any police officers outside of the law. However, a police officer, because he dons a police badge and gun and night stick and blackjack and mace and has the authority to make arrest and use that force to take custody and have that individual bound over by the Court for trial, he does not have the authority that places him above the law. And, when a police officer, just like a politician or anybody else, violates the laws, they must be held accountable for people to retain and maintain faith in the system, in our system, as it works.

For emphasis, the Assistant U. S. Attorney concluded with a forceful statement that by signing the indictment he and his superior were expressing their personal opinions that the evidence justified an indictment.

So, I just wanted to say that by Mr. Volz signing this indictment and also by my signing this indictment, this indicates that we think—this indicates that in evaluation of the evidence by us, it seems— we have concluded certain—that it has certainly satisfied the statutes and all the elements as dictated by the law. We are satisfied by the evidence that's been presented to this Jury, and it's up to you Ladies and Gentlemen to make your decision during your deliberations.

We agree with the recent decision by the Ninth Circuit that the mere fact that a "prosecutor's impression as to the guilt or innocence of the defendants had been conveyed to the grand jury" is not a sufficient basis for dismissal of an indictment, because grand jurors, as a practical matter ... are aware that a case is being presented to them because the prosecution feels that an indictment is warranted." *United States v. Cederquist*, 641 F.2d 1347, (9th Cir. 1981). But this clearly is not a case where the prosecutors merely conveyed their impression that the defendants were guilty. Instead, the prosecutors constantly reminded the grand jury that all four of them signed the indictment because in their opinion the jury should return it; they substituted their opinion as to the evidence for that of the grand jury, depriving the grand jury of its independence.

Another serious instance of objectionable activity on the part of the prosecutors occurred after a period of grand jury deliberation outside the presence of government attorneys, the duration of which is not indicated by the transcript. The grand jurors advised the prosecutors that they had "concluded [their] work." There is no transcript of that notification, but as soon as the government attorneys rejoined the grand jury (Tr. 175), the announcement was repeated on the record.

A JUROR:

We have a discussion going that—well, being in the final analysis of all the things that we had in the past, you know, that everyone had the chance to cast their ballot according to what they believed, and that it came out ten-ten. And, that's the way it stands. Do we go before the Federal Magistrate with this?

The juror's question is answered in the court's charge recommended by the Judicial Conference of the United States: "If less than 12 members of the Grand Jury vote in favor of an indictment which has been submitted to you for your consideration, the foreperson will endorse the indictment 'Not a True Bill' and return it to the court, and the court will impound it." The grand jury had been given similar advice by one of the prosecutors before its deliberation. (Tr. 174). The prosecutors' actions following the announcement of the 10–10 vote are astonishing. The government attorneys improperly participated in grand jury deliberations and exerted undue pressure to secure an indictment.

At the outset the grand jury was misled as to the effect of fewer than 12 votes for an indictment after full deliberation. The government attorneys should have advised the jury that it was obliged to follow the court's charge set forth above. Considering his earlier correct advice to the jury as to the effect of fewer than 12 votes for an indictment, the response of the government attorney to the juror's question, "Do we go before the Federal Magistrate with this?" is incredible:

> We have just encountered a point of law that I have never encountered before which is less than twelve Grand Jury votes.

The prosecutors then participated in the deliberations of the grand jury, in clear violation of the law.[7] At the very least, all three of the government attorneys then present participated in the grand jurors' deliberations concerning whether they wished to consider another indictment, different from that as to which they had voted a no true bill. After the deadlocked vote was announced, what occurred both on that evening and the next day was protracted deliberation, with the prosecutors and the jury participating—in effect an indictment negotiated by the government attorneys. At one point a prosecutor obviously realized that he and his associates were deliberating with the grand jury: "I don't want to get too much into your thoughts and deliberation process. I don't want to get into that at all." (Tr. 181). Nevertheless, the attorneys continued for a long time to deliberate with the jury, stressing repeatedly the importance and the lengthy duration of the investigation.

Much earlier in the session, (Tr. 24), a Civil Rights Division attorney properly advised the grand jury that during its own deliberations outside the presence of the prosecutors it could decide to indict on less than an entire indictment, but that the jury should not "call in the prosecution" and invite its participation in deliberations.

Notwithstanding, the prosecutors repeatedly and persistently probed into the jurors' thought processes after the vote was announced, refusing to accept the repeated statements by the jurors, of which the following at p. 184 of the transcript is an example:

> You asked for a decision. We have voted. We have voted on written ballots. There is no chance the count was not correct. It's over. That's it. Over. Finished.

Urged on by prosecutors, the jury again deliberated privately and voted to reconsider an indictment as to "the beatings" only. The prosecutors did not accept that decision by the jury. Instead, they engaged in lengthy deliberations with the jurors concerning what they considered unlawful detention.

When the grand jury deliberated the next day, they again did so with the active participation of the three prosecutors. (Tr. 266–272). When a grand juror asked the simple question, "...can the conspiracy count be dropped entirely?", the prosecutor engaged in a lengthy deliberation as to whether it should be dropped and pleaded not to do so, culminating in the following inflammatory and highly prejudicial statement concerning "evidence" never presented to the grand jury (Tr. 272–275):

> ...in fact, many, many, many more people were taken downtown and make allegations of having been beaten in the very same manner. All that evidence could be put in if there is a conspiracy charge in the indictment. That evidence, most likely, almost assuredly, would not be put in if the conspiracy charge were omitted.

Undue pressure was put upon the members of the grand jury to return some kind of indictment. In effect, the prosecutive team refused to accept any other result.

After the other prosecutor's misleading statement about the effect of the deadlock vote, the local Assistant United States Attorney then once again invoked the stature of the United States Attorney himself:

---

7. There is a serious question as to whether the lengthy discussion by prosecutors with various jurors before the formal deliberation culminating in the 10–10 vote also constituted prohibited participation in deliberation.

"Let me check with Mr. Volz and see what he wants.." (Underscoring added). Apparently he did just that, for the U. S. Attorney came in later with his chief assistant (there were then *five prosecutors* with the grand jury) and told the jury "what he wants." "I don't see why you don't do it tomorrow." (Tr. 211). To his credit, the statements of the U. S. Attorney were temperate and balanced. But the very presence of *the* United States Attorney and his chief assistant at this critical stage, after a long absence, both taking time out from their much publicized role in the "Brilab" trial, constituted undue pressure upon the grand jury to reconsider the vote and return an indictment. Their appearance served to underscore the earlier statements by his assistant that the U. S. Attorney was personally convinced that there was credible evidence of guilt. The appearance of these two additional prosecutors at that stage was clearly a coercive factor, albeit that it was undoubtedly well-intentioned.

We have referred several times to violations of the model grand jury charge recommended by the United States Judicial Conference and given to this jury when it began its work. The government attorneys permitted and indeed at times persuaded the jury to disregard two other injunctions in that charge:

"The content of your deliberations . . . may not be disclosed even to the government attorneys."

"Although you must work closely with the government, you must not yield your powers nor forego your independence of spirit."

In determining the validity of this indictment under all of the foregoing circumstances, the guilt or innocence of the defendants is of course not at issue. Indeed, the court's task here is not to review all of the evidence presented to the grand jury to determine whether it was sufficient to sustain an indictment, as an appellate court often must do to determine whether trial error was of sufficient magnitude to warrant setting aside a conviction.

As previously noted, we dismiss this indictment not only out of concern for constitutional due process but in exercise of our inherent supervisory powers as well. We must protect the rights of the accused in this case and also the integrity of the criminal justice system. The court has the duty of insuring that the grand jury performs its proper function in our system of justice by standing as the bulwark between the individual and the government. It is incumbent upon the court to supervise the grand jury process and, where necessary, to intervene to assure the independence of the grand jury. The 3d Circuit has articulately outlined the concerns involved in *United States v. Serubo*, 604 F.2d at 817.

We recognize that dismissal of an indictment may impose important costs upon the prosecution and the public. At a minimum, the government will be required to present its evidence to a grand jury unaffected by bias or prejudice. But the costs of continued unchecked prosecutorial misconduct are also substantial. This is particularly so before the grand jury, where the prosecutor operates without the check of a judge or a trained legal adversary, and virtually immune from public scrutiny. The prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants as well. For while in theory a trial provides the defendant with a full opportunity to contest and disprove the charges against him, in practice, the handing up of an indictment will often have a devastating personal and professional impact that a later dismissal or acquittal can never undo. Where the potential for abuse is so great, and the consequences of a mistaken indictment so serious, the ethical responsibilities of the prosecutor, and the obligation of the judiciary to protect against even the appearance of unfairness, are correspondingly heightened.

We have already noted the scarcity of precedent to guide prosecutors, grand juries and district courts. There are issues presented here as to which reasonable persons may well disagree. If this court is in

error in resolving these novel and difficult questions, the error can be remedied promptly by an expedited appeal. Moreover, the government could present the matter properly to another grand jury. If this order is reversed on appeal or if a proper indictment is later returned by another grand jury, the guilt or innocence of these defendants can then be determined at a trial unclouded by the issue of the validity of the indictment.

The court's decision should not be construed as an open invitation to invade grand jury secrecy in every case, nor as a limitation upon the right of a prosecutor fairly to summarize evidence and law prior to submission of an indictment to a grand jury for deliberation and decision. Neither does this decision imply that every error by a prosecutor in his conduct before a grand jury will result in an invalid indictment. Rather it is a signal to prosecutors that there are limits beyond which they cannot go in their relationship with grand juries. Even though they act in good faith and out of commendable motives in seeking an indictment, prosecutors can no more violate constitutional rights than can those they seek to prosecute for violating constitutional rights of others. It is a mark of the majesty of the United States Constitution that it applies alike to the murderers of officer Gregory Neupert, to those who would seek to shield these murderers, and to the policemen who seek to apprehend them. All who violate the law should be brought to justice, but only through lawful constitutional efforts.